LEWIS OZIER AND WIFE, *v.* TOWN OF HINESBURGH.

### *Highway.*

When a sudden and unforeseen defect occurs in a highway, without fault on the part of the town, such town is not chargeable for the damages resulting from such defect, unless it has been in default in respect to getting seasonable knowledge of the defect, or unless, having such knowledge, it was reasonably practicable to have repaired the defect, or put up a warning or barrier to avoid it, before the happening of the accident.

The injury sought to be recovered for was received while traveling alongside and west of the track designed by the town for travel. The defendant requested the court to

charge : "If the jury find that the east road, at the time of the accident, was in good and sufficient repair, and was of sufficient width, and in proper condition to accommodate all the travel which then had occasion to use it; and that from its position, form and construction, it was apparently the place designed by the town as its highway; and that Mrs. Ozier and her son, voluntarily, or by mere choice of their horse, left the wrought way and went upon the west track,—it being conceded that that track was never worked by the town—the defendant is entitled to a verdict, no matter what the motive for the diversion, or the condition of the margin." *Held*, that the defendant was entitled to have this request answered affirmatively.

CASE to recover for an injury alleged to have been sustained by the wife of Lewis Ozier, by reason of the insufficiency of a highway in the town of Hinesburgh. Plea, the general issue, trial by jury, September term, 1871, PIERPOINT, Ch. J., presiding, and verdict for the plaintiffs.

On the trial the following facts appeared without dispute :

From time beyond memory until the occurrence of the injury complained of, there had been a highway leading north and south through the town and through the village of Hinesburgh, which it was the legal duty of that town to keep in repair. Upon either side of this highway in said village, there was, at the time of the accident, and ever had been, a fence — the distance between the fences being about seventy-five feet. On the westerly side of the highway, and standing a little farther west than the fence, was a building, which from some time prior to 1831, until some time between 1855 and 1858, was used as a woolen factory, the machinery in which was propelled by water from the east side of the highway, which was taken to the factory by means of a canal which crossed the road about eight rods north-easterly of the factory. South of the factory, and within a distance of about fifteen rods from it, there were, and ever since have been, three private dwelling houses, standing nearly upon the westerly line of the highway as so fenced out. Between 1855 and 1858, the woolen factory was converted into a custom grist-mill, and has ever since been so used, when there was a supply of water for that purpose, which was generally the case, except in dry times. From the earliest recollection of said highway, there has been a wrought traveled track or carriage-way through the village, which has been repaired by the town, the centre line of which was twenty-five feet from the east fence and fifty feet from the west fence. In

the spring of 1857, this carriage-way, from the bridge over said canal, to a point south of the southerly junction of said carriage-way, and the side track hereinafter mentioned ( a distance of about twenty-five rods), was thoroughly repaired and Macadamized by the selectmen of Hinesburgh, so that its width between the points aforesaid was eighteen to twenty-two feet, its steepest grade, rising toward the north, was about one foot to the rod, and its entire surface was even and smooth, and it has so remained ever since. From the centre of said carriage-way or track opposite the grist-mill, to the mill, the distance is four rods, the ground at the mill being about four feet lower than the centre of the carriage-way, and the intermediate ground, as well as that for some rods both north and south of it, is naturally even and smooth, and feasible for travel with teams and otherwise, although the town has never expended any labor upon it, or done anything to furnish access to the mill from said carriage-way. Since the conversion of the woolen-factory into a grist-mill, people having occasion to go to the mill with teams from the south, have generally been in the habit of gradually diverging to the west, from the path so worked and maintained by the town, at a point about fifteen rods south of the mill, and of passing to the mill over the lateral space between the wrought path and the west fence, and turning again by a track leading north easterly from the mill, into the east track, at or near said bridge. The descent from the wrought way into this side track at their southerly junction, is only about twenty-two inches, and not steep enough to afford any appreciable impediment to travel, and the ground over which the side track passes is naturally smooth and even, and of an easy grade, though a portion of it is a clayey soil, and in that part more apt to be muddy than the wrought way ; and the track itself throughout is well beaten by travel and has never been obstructed. People coming from the north also, destined farther south than the grist-mill, and having business at the mill, were in like manner accustomed to pass over the side track. A portion, however, of the travel to the mill, whether from the north or from the south, has always been accustomed to pass over the wrought way, and of approaching the mill more nearly in front, and then turn-

ing to the mill, as it was entirely practicable, safe and easy to do ; and often people in going to the mill were accustomed to go by one track and return by the other. The side track was also used in a similar manner, although to a much less extent, while the grist-mill building was used for a factory. At times, too, when the snow has been thawed off from the wrought track, rendering the sleighing there poorer than upon the side track, some travel, not going to the mill, has passed over the side track for the purpose of obtaining better sleighing. And so, too, prior to 1857, when the earth was washed off from a ledge which runs under the east road, teams passed over the west one, for the purpose of avoiding the ledge. This ledge is about six rods south of the grist-mill, and is at the highest point in the wrought way, being about six feet higher than the west track, opposite ; and from said highest point to the bridge, there is a gradual descent in the east track of about one inch to the rod.

From the southerly intersection of the two tracks, to the mill, the distance by the side track is about six feet less than by the other. No repairs or labor of any kind were ever done by the town, or by any of its officers, upon the side track, or outside of the wrought way aforesaid, except to make a ditch on the east side of it, and that when the wrought way was repaired in the spring of 1857, as above stated, the ground immediately on the west margin of the wrought way, at the place of intersection of the two tracks, and for about nine rods northerly, was ploughed up and scraped into the wrought way ; but not so as to prevent travel on the side track, although the descent to it was thereby for a time rendered considerably more abrupt. Nor has the town of Hinesburgh ever adopted the side track as a highway for travel, unless such adoption can be implied from its use in the manner and under the circumstances above stated. Nor was there any evidence that the wrought way had been adopted as the place for travel, except its character, condition and position, and the fact of its long continued use by the public, and that it had been kept in repair by the town. The village of Hinesburgh has but one principal street. The village contains three churches, two stores, two tailor shops, a milliner shop, a grist-mill, a tannery, a

blacksmith shop, a hotel, and fifty or sixty dwellings. The defendant introduced evidence tending to show that the wrought way above mentioned was amply sufficient in character and dimensions, as well as in quality, for the accommodation of all travel accustomed to pass, or that might reasonably be expected to pass over said highway.

The testimony on the part of the plaintiffs, not contradicted, tended to show that the position of a vehicle approaching the grist-mill by the side track is slightly more favorable to the loading and unloading of grists, than when the mill is approached more directly from the wrought way, as above stated.

The testimony of some of the plaintiffs' witnesses also tended to show that those witnesses and others, many years prior to 1857, and since, from mere choice, used the west track, for drawing loads, when the persons so using it had no occasion to go to the factory or grist-mill, for the reason, as they testified, that it was the best road.

The testimony on the part of the plaintiffs also tended to show that they had been accustomed to do business at said grist-mill for several years, and that in going to it from the south they usually went by the side track although they had been accustomed to go the other way occasionally. That on the 19th day of May, 1868, Mrs. Ozier, one of the plaintiffs, and her son, of the age of nearly thirteen years, with a horse and wagon, came into the village of Hinesburgh from the south, from their home, intending to go to the grist-mill; that on reaching the southerly point of union between the two tracks aforesaid — the boy acting as driver, and the horse going at a slow trot — the boy reined the horse into the side track, at the customary place, and before the hind wheels of their wagon had fairly left the wrought way, the fore-legs of the horse settled into a mud-hole in the side track, nearly to his belly, whereby the wagon was suddenly stopped, and Mrs. Ozier was thrown forward on to the dash-board and cross-bar of the wagon, and was seriously injured.

The testimony on the part of the defendant tended to show that in leaving the wrought way upon the occasion in question, Mrs. Ozier and her son turned out several feet farther north than

the usual place of turning out, and that at the place where they turned out the descent to the side track was considerably greater and more abrupt than at the customary place of turning out, and the danger much greater.

The testimony on the part of the plaintiffs also tended to show that the soft place in which the horse sank as aforesaid, had existed for a considerable length of time previous to the accident, and that several other persons had previously driven into it, and that notice of its existence had been given to one of the selectmen of Hinesburgh several days before the accident.

The testimony on the part of the defendant tended to show that the soft place in question was caused by the sudden escape of water from a private aqueduct which extended along under the side track, and had been there for more than twenty-five years, without producing any effect upon the surface of the ground; that said soft place had existed but a few hours, at the longest, previous to the accident, and that the plaintiffs' horse was the first to break through into the mud below; that the existence of such a place was not known to any of the town authorities or inhabitants, and that no notice of it had ever been given to either of the selectmen of the town.

Among other requests which were satisfactorily responded to by the court, the defendant requested the court to charge the jury as follows:

If, in the present case, the jury find that the east road, at the time of the accident, was in good and sufficient repair, and was of sufficient width and in proper condition to accommodate all the travel which then had occasion to use it; and that from its position, form and construction, it was apparently the place designed by the town as its highway; and that Mrs. Ozier and her son voluntarily, or by mere choice of their horse, left the wrought way, and went upon the west track—it being conceded that that track was never worked by the town,—the defendant is entitled to a verdict, no matter what the motive for the diversion, or the condition of the margin.

Except as hereinafter stated, the court declined to so charge, and upon the points embraced in the above recited request, charged the jury in substance as follows:

As a general rule, towns are not required to work the entire width of the road as laid out, so as to render the whole of it suitable for travel, unless such width of wrought road is required for the reasonable accommodation of the public having occasion to use it for purposes of travel. But towns have a right to have two tracks for travel in their highways, and it is not uncommon to find two traveled tracks, each traveled as much as the other; and when towns suffer this to exist, they are bound to keep both tracks in repair.

If they desire to prevent the public from using two tracks, and to confine the travel to one only, they must construct proper barriers to prevent the use of one of the tracks, or to otherwise indicate which is the one to be traveled.

Conceding the east track to have been precisely in the condition which the defendant's request implies, still, as matter of law, to govern this trial, if the jury find from the evidence, that for a great many years (and the testimony shows it was thirty or forty) the public has been accustomed to travel upon the west track—it being conceded that that track was within the limits of the highway—as one of the traveled tracks of the highway, and a place where people coming from the south to the mill, and to the houses on the west side of the road, usually travel, and this was the most natural and convenient way to get to the mill; and that it was used to a certain extent, as the testimony tends to show, for through travel, north and south, and was used by people coming to the mill from the north, and destined farther south, — the town was bound to keep it in suitable condition for travel, as much as it was the other, or east track, or else to indicate in some way to the public so that they could understand it, that the west track was not a part of the highway for travel; and whether or not there was such indication, is for the jury to determine. The rule here laid down, however, does not apply to those cases, where, by reason of mud, scarcity of snow, &c., people occasionally travel upon the margins of the wrought way.

If, by reason of the soft place into which the plaintiff's horse sank, the road was, on that occasion, unsafe and insufficient, the question is, how long had it existed? If, by reason of the action of frost or water, the defect complained of was brought suddenly to the light, or to the surface, so as to become suddenly unsafe, the town would not be liable unless actually notified of its existence, before the accident.

If the defect existed even but a very few minutes before the accident (and upon this point the testimony is conflicting) and its existence was known to the town officers, it was their duty to put

up barriers to keep travelers away from it; but if it was developed immediately prior to the accident, and the town officers did not know it, and were not guilty of negligence in not knowing it, the town is not liable.

If the defect had existed for so long a time that the town officers might by the exercise of reasonable diligence have known of it, it is the same in law as if they had actual knowledge, and the town is liable in this action, the other necessary facts being found.

The burden of showing notice of the defect, to the proper town officers, or that it had existed so long that they could, and ought, in the exercise of reasonable diligence to have known it, is on the plaintiffs.

To the omission of the court to charge as so requested, and to the charge as above detailed, the defendant excepted.

*E. R. Hard* and *E. J. Phelps*, for the defendant.

When a sufficient roadway of ample dimensions and plain to be distinguished has been provided, the duty of the town is discharged; and whoever prefers to travel in any other part of the highway has a right to do so but does it at his own risk. This rule is not only the plain result of the legal principles applicable to the subject, but is established by repeated decisions of this court. *Rice* v. *Montpelier*, 19 Vt., 470; *Whitney* v. *Essex*, 38 Vt., 274; *Morse* v. *Richmond*, 41 Vt., 439. To the same effect also are the cases *Shepardson* v. *Coleraine*, 13 Met., 55; *Raymond* v. *Lowell*, 6 Cush., 524; *Smith* v. *Wendell*, 7 Cush., 498; *Kellogg* v. *N. Hampton*, 4 Gray, 65. Where recoveries have been had for accidents outside the worked path the traveler has been forced out either by accident or by the unsafe or obstructed condition of the path itself. Such are the cases *Cassidy* v. *Stockbridge*, 21 Vt.; *Gladden* v. *Reading*, 38 Vt., 52; *Johnson* v. *Whitefield*, 18 Maine, 286.

The court erred in their instruction to the jury relative to the liability of the defendants in case the defect in the highway was proved to have been of very recent occurrence. The evidence on the part of the defense tended to show that the defect in question was of sudden origin — had existed but a very few minutes if at all before the accident occurred, and that none of the town authorities knew of it. The plaintiffs' evidence tended to show no-

tice to the town authorities.    The court charged that " if the defect
existed even but a very few minutes before the accident (and upon
this point the testimony is conflicting) and its existence was
known to the town officers, it was their duty to put up barriers to
keep travelers away from it."    This instruction was in no respect
qualified or limited in any part of the charge.    It made the de-
fendants liable if *any* notice of the defect reached the town au-
thorities before the accident, even if only " *but a very few min-
utes* " before.

   The charge on this point cannot be supported, and was most det-
rimental and propably fatal to the defendants on a material closely
contested point.    In order to make the town liable for a sudden
obstruction of that character, not reasonably to be anticipated, it
must either have existed so long that the authorities, in the exer-
ercise of ordinary diligence, were bound to have known of and
repaired it ; or if actual notice is relied on, it should appear to
have been given long enough before the accident to have enabled
the town officers by ordinary diligence to have remedied the de-
fect.    What would be ordinary diligence would depend on the
circumstraces and would be a question for the jury.    It would be
determined in view of the nature and importance of the defect,
the distance of the officers notified from the place, the time,
the weather, means of action, etc.    In any event reasonable time
and opportunity would be allowed.    But under the charge of the
court, actual notice before the time of the accident, to any town
authority, is sufficient.    And fifteen minutes intelligence of this
little mud-hole outside the roadway, to an officer three miles off
and engaged in other duty, would render the town liable to any
plaintiff active enough to outrun him and to sustain the usual
" permanent injury" before by the extremest speed the official
could arrive.

   *Daniel Roberts* and *Henry Ballard*, for the plaintiffs.

   If this track was not a highway for travel " it was so left as to
mislead the traveler as to which was the lawful public highway";
and so our case stands upon the distinction recognized in *Whitney*
v. *Essex*, 38 Vt.: the jury have found under the charge that

there existed this dangerous pitfall and that the town authorities knew of it and had neglected to warn or guard the traveler against it. If the traveler be so misled and is chargeable with no negligence in being so misled, it is the same as if forced out of the track for travel by accident or necessity. In point are *Goodrich* v. *Colchester*, Chit. Co., 1855; *Willey* v. *Portsmouth*, 35 N. H., 303; *Davis* v. *Hill*, 41 N. Y., 329; *Hayden* v. *Attleboro*, 7 Gray, 338; *Coggswell* v. *Lexington*, 4 Cush., 307; *Burnham* v. *Boston*, 10 Allen, 290; *Cobb* v. *Standish*, 14 Maine, 198.

The case *Cobb* v. *Standish*, 14 Maine, 198, is called by DAVIS, J., in *Rice* v. *Montpelier*, 19 Vt., 474 — after an imperfect statement of it — an " extraordinary decision "; but it is cited as authority in *Willey* v. *Portsmouth*, 35 N. H., and it may be questioned whether if the case of *Rice* v. *Montpelier* were now for the first time brought before the court, it would not experience a different handling. The cases of *Shepardson* v. *Coleraine*, 13 Met., 55; *Smith* v. *Wendell*, 7 Cush., 498; and *Kellogg* v. *Northamptn*, 4 Gray, 65, were before the court in *Gladden* v. *Reading*, 38 Vt., 52; and ALDIS, J., says of them (p. 56), " we think the Massachusetts cases have gone further than any decisions in this State to exempt the towns from liability."

The opinion of the court was delivered by

BARRETT, J. In view of the criticisms of the learned counsel on each other as to the getting up of the bill of exceptions as it is now presented, we take occasion to remark that this court derives its authentic knowledge of the case from the bill of exceptions alone.

Upon the case as it is certified by the presiding judge of the county court, it appears that he failed in the charge to the jury to present an idea material to the rights of the defendant, and founded in the solid principles and reasons of the law of this class of cases. When a sudden and unforeseen defect occurs in a highway, without fault on the part of the town, such town is not chargeable for the damage resulting from such defect, unless it has been in default in respect to getting seasonable knowledge of the defect; or unless, having such knowledge, it was reasonably

practicable to have repaired the defect, or put up a warning or barrier to avoid it, before the happening of the accident. Upon the evidence, this view, we think, ought in some proper way to have been presented to the jury. We can surmise that it was so presented in fact; but the bill of exceptions indicates that it was not, and for this the judgment is to be reversed.

We think the defendant was entitled to have the first printed request answered affirmatively in the charge. While we approbate what the judge said on the subject of the duty of the town in respect to the west track, upon the evidence and the claim of the plaintiffs, we do not find ourselves fully concurring, whether in the charge as given in the exceptions, the judge accorded to the defendant an adequate answer to that request. So we leave that matter without further remark.

Judgment reversed, and cause remanded.