## STRONG *v.* WALES AND OTHERS.

### [IN CHANCERY.]

*Prescription. User. Character of Possession.*

In 1798, the original proprietors of Burlington "set off for the use of the publick" a certain square in the village of Burlington. In 1809, the selectmen of Burlington, pursuant to an enabling act, executed a perpetual lease of a lot in the north-east corner thereof to the owner of a building that had been previously erected thereon for use in part as a jailor's house and in part as an inn. In 1839, through several mesne conveyances, the title to the lot and building came to the orator, who immediately converted the building into stores, and as such the building thereafter continued to be used. The building covered the entire lot, except a strip on the west side eleven feet wide. For many years the square was vacant, except so far as occupied by the orator's building and a few other buildings, public and private, south of it on the same street line ; and until about 1835 it was unenclosed, common, and freely traversed by the public in vehicles and on foot in every direction. In 1835, the town enclosed the western part of the square with a fence, but left a vacant space about three rods wide extending from street to street along next west of the orator's building and the buildings south of it. That space or way was thence taken care of by the town and the city the same as other highways and streets were, and was freely traversed by the public in vehicles and on foot. The eleven-feet strip was traversed in the same manner by the public in passing and repassing, and by the public and the orator's tenants in going to and from the stores in the orator's building, and was kept in repair by the orator or his tenants. The steps of the building projected onto it several feet in some places, and on the north end of it, about three feet from the building, was a post that had been used in connection with one of the stores for more than thirty years ; but there never was any fence or other apparent mark separating the strip from the rest of the square. Down to about 1830, the only public and unobstructed way of approach to the building was on the west side and over said strip ; but about that time the street on the

east side of the square and of the several buildings was wrought for travel; the principal entrance, however, continued to be on the west side until about 1840; and the entrance on that side continued to be as much used as the other until about 1874, when the defendants, street commissioners of Burlington, acting under authority of the city council, sought to erect curbing along the north and south sides of the square so as to exclude carriages and teams from said way; whereupon the orator filed a bill to restrain them. *Held*, that as the use by the public of the eleven-feet strip tended rather to the creation of an easement in the orator than of a right against him, the orator had title thereto against the right of the city or of the public to exclude him from such use thereof as he had thitherto had; but that there had been no use of that part of the square next west of that strip such as to change it from a common to a highway, nor such as to give the orator a right therein adverse to that of the public.

APPEAL from the Court of Chancery.

The bill alleged that the orator was, and for more than thirty-five years these last past had been, the owner and in possession of a certain piece of land situated in Burlington, and described as follows, viz.: "Beginning at the south-west corner of College and Church streets; thence southerly, in the east line of Church street, 89 feet; thence westerly, parallel with College street, 95 feet; thence northerly, parallel with Church street, 89 feet, to the south line of College street; thence easterly, in the south line of College street, 95 feet, to the place of beginning; excepting therefrom a piece off from the north-east corner of said land about forty feet square, which is owned and occupied by Samuel Huntington"; that long previous to 1808, one Lyman King, at the request of the selectmen of Burlington, had erected, and thereafter continued to occupy, a building thereon that he used as a hotel, adjoining the county jail, which also then stood on said land, or lands adjoining; that said King, in consideration that the court would confirm to him, his heirs and assigns, forever, the quiet possession of the land whereon said hotel was erected, in square form, 95 feet east and west, and 89 feet north and south, being the land above described, prior to the passage of the act of the Legislature hereinafter mentioned, conveyed to the County of Chittenden half an acre of land on the east side of Church street, in Burlington, where the county jail has since been erected and now stands; that in consequence of doubts having arisen as to the power of the County Court to confirm said privilege, the Legislature, on November 7, 1808, passed an act authorizing the selectmen of Burlington to lease said land to said King, his heirs and assigns, by a perpetual lease, reserving one pepper corn yearly rent; that thereupon, in pursuance of said act, said selectmen, on March 17, 1809, duly executed and delivered a lease of said land, with the appurtenances, to said King, his heirs and assigns,

forever, reserving one pepper corn yearly rent ; that on August 7, 1812, said King conveyed said land, with the appurtenances, to Ozias Buell and Lynde Catlin, who on June 23, 1823, conveyed the same to Henry Thomas, who on January 28, 1839, conveyed the same to the orator and Timothy F. Strong ; that on April 1, 1848, said Timothy conveyed all his interest therein to the orator ; that ever since March 17, 1809, said King and his said successors in title have continued to hold, occupy, and possess said land, with the appurtenances, solely to themselves and for their own benefit, and adversely to all other persons ; and that at the time of the filing of this bill, the orator so held, occupied, and possessed the same ; that said building continued to be occupied as a hotel until 1839 ; that during that time, the front and main entrance thereto was on the west side thereof by means of the highway hereinafter described ; that Church street—the street on the east side of said land, was not then open nor improved as a highway, but was obstructed, and not used as the ordinary means of access to said building, and that among the appurtenances of said land at the time of the execution and delivery of said lease were the right and means of approach and entrance to said land and the building thereon by means of the highway hereinafter described ; that since 1839, said building had been used for stores, and the main front and entrance thereof had continued to the time of the filing of the bill to be by the west side thereof, and the sole approach to said west side had ever been by means of said highway ; that for more than fifteen years previous to 1809, there was and ever since had been a public, open, and unobstructed highway immediately to the west of said land of the orator, used by the public as a highway for all purposes of passage in vehicles, on foot, and by other methods of ordinary travel ; that said highway had during all said time extended from College street to Main street, in front of said land and the court house and other buildings to the south thereof, and was long previous to 1809, and ever since had been, used by the public, not only as a means of passage between those streets, but also as a means of access to and departure from said land and the buildings thereon, and said court house and other buildings, and also during said time had been used by said King and his successors in the ownership of said land, in their private capacity and as a private right, as a means of access to and departure from said land and building, whereby the orator had right of way over the land covered by said highway for all modes of travel, to and from said land and building ; that said highway was about four rods wide, and open and unobstructed for all kinds of travel both in vehicles and on

foot; and had always been, whenever occasion required, worked and repaired as a highway by the highway authorities of the town, and afterwards of the city, of Burlington, and had ever been accepted and treated by the town and city and by the highway authorities thereof as one of the public highways of said town and city; that said building was known by the name of " Strong's building," and was situated upon and covered the whole of said land, except a strip eleven feet in width extending north and south 89 feet, the full length of said land immediately west of and adjoining said building, which said strip was on the westerly side of said land, and on the easterly side of said highway.

The bill further alleged, that the orator was the owner, and since 1839 had been in possession and enjoyment adversely to all other persons, of a certain other tract of land 24 feet wide from north to south and 85 feet from east to west, next south of and adjoining said land so leased to said King and on the east side of said highway, on which had stood ever since 1839, a three-story building, occupied by the orator and his tenants for stores and other purposes; that said highway ever since 1839 constituted the sole approach and means of access to the west side of said last-mentioned land and the building thereon, and was always so used by the public and the orator and his tenants as a means of access to and departure from the west side of said land and building; that the orator had the right to have such highway forever remain open and unobstructed from College street to Main street, for all kinds of travel, both in vehicles and on foot, as a means of access to and departure from said two tracts of land and buildings thereon, or, at least, until regularly and lawfully discontinued as a highway, and until the orator should have been paid by the city of Burlington such damages, duly ascertained and fixed according to law, as he should be found to have sustained by such discontinuance; that on September 21, 1874, the board of aldermen of the city of Burlington, disregarding the rights of the orator in the premises, against his will, and without there having been any discontinuance of said highway, adopted a resolution in the words and figures following, to wit:

That the Street Commissioners of the city be and they are hereby directed to cause a curb of stone to be placed around the City Hall Park on the north-west and south sides thereof, on the line now established for such curbing, and so curb that portion of said park lying immediately to the west of and adjacent to the city hall, old court house, and the buildings known as " Strong's building," heretofore in use as a carriage-way, as to exclude carriages and teams therefrom; but the same shall remain and continue a public common and highway for all citizens of the State at all times on foot to pass and repass, walk, and remain therein at their pleasure, as they have heretofore done; and the com-

mittee on public buildings and parks are hereby directed to cause said park to be graded, ornamented, turfed, and laid out with suitable avenues, paths, and walks, as in the judgment of the city council the public health, convenience, enjoyment, comfort, and interest will by such use and appropriation be promoted, increased, enhanced, and secured, and that thereby said park will better subserve, promote, and accomplish the ends and objects for which it was set apart and dedicated.

That on September 22, 1874, said resolution was approved by the mayor of said city ; that the defendants, Torrey E. Wales, Elliot M. Sutton, and Orville Sinclear, street commissioners of said city, claiming to act under the authority of said resolution, were proceeding and threatening forthwith to erect a curb of stone across said highway at the north and south ends thereof, on the south line of College street and the north line of Main street, and across the north end of said strip of land eleven feet wide, so as to obstruct said highway, and exclude carriages and teams therefrom, and to prevent access to said strip of land from College street by carriages and teams ; all which, &c. *Prayer* for an injunction against the erection of any curb or other obstruction that would exclude carriages or teams from access to said highway or said strip of land, or any part thereof, and for general relief.

The answer alleged that the square whereof the land described in the bill formed a part, bounded on the north by College street, on the east by Church street, on the south by Main street, and on the west by St. Paul street, was, and for more than eighty years had been, except as thereinafter described, a public square or common, know before the incorporation of the city as Court House Square, and afterwards as City Hall Park, and then and during all that time possessed and enjoyed as such by the public ; that the land therein embraced originally belonged to the original proprietors of the township as undivided lands, and that the fee thereof still remained in them or their heirs and assigns ; that in 1790, the land adjacent to said square was plotted, and lots sold to purchasers who took " upon the faith of and in reference to " the dedication of said square to public use ; that on June 25, 1798, the county court-house and jail having been erected on the easterly side of said square, said proprietors, at a regular meeting, by vote and resolution, set off and dedicated said square " to the use of the publick, for the erection of all necessary county and town buildings for public use," and that said dedication was accepted by the town and the public ; that the two pieces of land described in the bill as belonging to the orator always had been and were a part of said square ; that the whole of said first piece was occupied and enjoyed by the public according to the terms of

its dedication from the time of its dedication to March 17, 1809, when the pretended lease was made, except that it was occupied by the county jail and jail-house; and that the second piece was continuously occupied and enjoyed by the public from the time of its dedication to 1844, when the orator wrongfully took possession of a part thereof, as thereinafter stated. The answer admitted that the Legislature passed the act alleged, and that the selectmen executed the lease as alleged, but alleged that said lease was executed and delivered after said square had been accepted by the public and the town, and occupied by the public as a public square for more than eighteen years, and long after the land adjacent thereto had been sold as aforesaid; that neither said town nor its selectmen had any right to lease said land; that said pretended lease was a wrongful invasion of the rights of the public under said dedication and use; that said act of the Legislature conferred no authority on said town or selectmen to lease said land; that the Legislature had no constitutional right to authorize said leasing; that said lease conferred no title or interest in said land upon said King, and that said King never otherwise acquired any right, title, or interest therein. The answer admitted that prior to 1808, said King erected and thereafter continued to occupy a building on said land adjoining the county jail, which also stood on said land, and that he used it to some extent as a hotel; but alleged that said building was erected and used for a jail-house, and that from the time of its erection to 1807, said King, who was then the sheriff of the county, was the jail-keeper, and occupied said building as a dwelling-house and jailor's house, and as a necessary adjunct to said jail, and also as a hotel for the accommodation of the public in attendance upon court; that in 1807, said jail was removed and a jailor's house built on the new location; that on the removal of said jail, &c., said dwelling house ceased to be a building for public use, or for town or county purposes, and that the maintenance and continuance thereof on said land became unlawful and a public nuisance, and ever since and still continued so to be; that the erection of said building on said square gave said King, his successors and assigns, no right, title, nor interest in the land on which it stood, nor any right to maintain and continue any building thereon, except buildings for town or county use, after the removal of said jail as aforesaid. The answer also admitted the alleged conveyance by said King to Chittenden County, but alleged that said county never had any right, title, nor interest in, nor authority over, the land leased in consideration therefor, except to use the same as a site for necessary county buildings. The answer also admitted that there were pretended

conveyances of said land by said King to said Buel & Catlin, and by them to said Thomas, and by Thomas to the orator and Timothy F. Strong, and by said Timothy F. to the orator, as alleged, and that said conveyances were regular in form ; but denied that either the orator or any of said pretended grantees thereby or otherwise acquired any right, title, or interest in or to said land or any part thereof; admitted that ever after March 17, 1809, said King and his grantees and successors had been, and that the orator still was, personally in possession of said land, except a strip on the westerly side thereof eleven feet in width, described in the bill, and except a strip on the easterly side thereof adjoining Church street, 51 feet in length north and south, and 43 feet in width east and west, directly south of and adjoining the lot occupied by said Huntington as alleged, but denied that such possession had conferred on the orator any right, title, or interest in·or to said land, or said strip first mentioned ; admitted that all of said land, except said first-mentioned strip, was and had been occupied by a building known as Strong's building, and that said building was used as a hotel from 1808 to 1839, but alleged that previous to 1807, and until the removal of the jail as aforesaid, it was used as therein before alleged ; admitted that down to 1839, the front and main entrance was on the west side thereof, but alleged that such entrance was by means of said square, and not otherwise ; that the lands lying on the west side of and adjacent to the two parcels in the bill described, and the land south of and adjacent to the tract secondly described, extending to Main street on the south, College street on the north, and St. Paul street on the west, all now actually covered by buildings, ever had been and still was a part of said square, and that that part of said square lying next west of said two tracts of land, and of the buildings south thereof, had ever since the dedication of said square lain open and unenclosed, and that that portion of said square was what was described in the bill as a public highway ; that there never was a public highway laid out and worked over or through that portion of said square, nor any ever adopted or accepted by said proprietors, or by said town or city ; admitted that during the time mentioned in the bill, there had been no obstruction to passage to and fro over said land with carriages and on foot, and that the public had been permitted to use and had used it as a common passage-way from street to street, and to and from said tracts of land and buildings thereon, and to and from said court-house and city hall, and that said King, his successors and the orator, were permitted to use and had used it as members of the general public, in going to and from said two tracts, but in no

Strong *v.* Wales et als.

other manner ; but denied that such way had ever become appurtenant to the land in the bill described. The answer further alleged, that although the public and said King and his successors, including the orator, had so used that portion of said square, yet that none of them thereby acquired any right to have it kept open as a carriage-way, because by law and the charter of said city the duty and right to manage and improve it, and regulate its use by the public, devolved upon and belonged to the city council, which at the time of the passage of said resolution was, and still was, fully authorized and empowered by law and said charter to manage and improve the same, and to regulate the use thereof by the public and the orator, and to that end, among other things, placed a curb of stone around the same ; that not only had the city council and the defendants full power and authority under the express laws of the State so to do, but had like power conferred in writing by the proprietors of Burlington, on September 1, 1874, and before the bringing of the bill. The answer further alleged, that the city council, having at a lawful meeting held on September 21, 1874, decided that the public interest, &c., demanded that said square be graded, &c., and a curb of stone placed around it, and that that portion thereof lying immediately west of and adjacent to the city hall, old court-house, and said Strong's building, theretofore used as a carriage-way as aforesaid, be so curbed as to exclude teams and carriages therefrom, duly passed said resolution, as it was authorized to do ; and that the defendants were proceeding to place said curbing in accordance with said resolution ; that in the exercise of the authority conferred upon them, the public authorities had, long before the passing of said resolution, reclaimed and improved such portion of said square as lay to the west of the alleged carriage-way, and had excluded carriages, &c., therefrom, and that the city council and the defendants had authority in like manner to reclaim and improve the remainder of said square, including the portion used as such carriage-way. The answer denied that either said King or any of his successors, by the use of said portion of said square as a carriage-way or otherwise, had acquired any private right of way over the same, or any greater or other right than the public had therein ; admitted that the building erected by King as aforesaid, had, since 1839, been used for stores, and that the main front was on the west side thereof ; but alleged that during the last ten years it had been by the north and east sides thereof ; denied that King or any of his successors ever had any possession or occupancy of said eleven-feet strip as alleged, and averred that no part thereof was ever inclosed or obstructed by any one, but

that ever since said square was dedicated to the public as aforesaid, it had remained open, unenclosed, and unobstructed, and always had been, and still was, in the occupancy and enjoyment of the public as a part of said square ; alleged that said Thomas, on March 26, 1825, conveyed said eleven-feet strip to Burlington, to be forever kept open as a public common, and that such grant and dedication were accepted by said town, by the public, and had ever remained as the right of the public, not resumed, and incapable of resumption by said Thomas or his successors, and in no way lawfully conveyed to him or them or to the orator.

As to the other tract of land in the bill secondly described, the answer denied that the orator ever was the owner thereof, or ever had any right, title, or interest therein, and alleged that it was a part of said square, and that from the time of the dedication of said square it was open, unenclosed, and unobstructed, and in the possession and enjoyment of the public as a part of said square, and that the public during all that time were accustomed to walk and ride therein at will, and to pass and repass on foot and in vehicles over the same ; that in 1827, said Thomas wrongfully erected on said last-mentioned tract the principal part of the building described in the bill as still being thereon, but erected it upon posts set in the ground, with intent to evade liability for erecting and maintaining a nuisance on said square ; that the lower story of said building remained open and unobstructed until 1844, and that the public continued to use the land over which said building was erected as a carriage and foot-way, the same as they did other portions of said square ; that at the August Term, 1832, of Chittenden County Court, said Thomas was indicted for erecting and maintaining a public nuisance on said square in the erection and maintaining thereon of said building, and at the March Term, 1833, was convicted thereof ; that the case was then continued for sentence, but that no sentence was ever passed, and that Thomas wrongfully continued to maintain said building, and remained in possession thereof, but without interfering with the use by the public of the land over which it was built, until January 28, 1839, when the orator unlawfully and wrongfully entered into possession thereof, well knowing that it had been adjudged to be a public nuisance as aforesaid.    The answer admitted that the orator had been in possession and occupancy of said building since 1839, and of the land over which it was erected since 1844, but alleged that down to 1844, said land remained open and unobstructed, when the orator wrongfully obstructed and inclosed the same, except a piece thereof 18 feet east and west and 24 feet

47

north and south, on the east end of said tract, and constructed in such inclosure a store, which had ever since been in his possession and occupancy; and alleged that the building erected by Thomas, and the addition made thereto and the obstructions and inclosure erected and maintained thereon by the orator, were public nuisances on said square; that at the September Term, 1852, of said court, an information was filed against the orator for erecting and maintaining a public nuisance on said square in the maintenance of said buildings, &c.; but that the clerk of said court having omitted to indorse on said information a minute of the day and year when the same was presented, it was for that reason dismissed at the April Term, 1853; that at the September Term, 1874, an indictment was found against the orator for erecting and maintaining a public nuisance on said square, by the erection and maintenance of said buildings, &c., thereon, which was still pending; admitted that said last-mentioned land lay on the east side of said square, but denied that that portion of said square on the west thereof, and called in the bill a public highway, had ever constituted the sole approach and means of access to said land, or the buildings thereon; and alleged that for more than seventy-five years these last past, there had been and still was a public highway adjoining said tract on the east, open, unobstructed, and sufficient for all kinds of travel, which for more than thirty years had and still afforded an ample and complete avenue of access to and departure from said land and the buildings thereon, and all the stores, shops, and rooms therein for all purposes whatsoever; that for more than seventy-five years there had been and still were public highways along and adjoining the north and east sides of the other tract of land, and that said highways always had and still afforded ample and convenient avenues of approach to and departure from said land and buildings and all the stores thereon, for all kinds of business and the transportation of all kinds of merchandise; that all the stores fronted and had entrances from said highways, and that for twenty years said highways had been used by the orator and his tenants and by the public as the chief and usual means of access to said land and buildings, and that said avenues and means of approach were all that was necessary for the full and complete enjoyment of said land and buildings; that if it were true that the orator was the owner of said land, or of any part thereof, the improvements contemplated would be a benefit thereto; and denied that the placing of said curbing would work irreparable injury to the orator or to the public.

The answer was traversed and testimony taken. It was agreed that Court House Square, containing two and a half acres, was orig-

ally owned by the proprietors of Burlington; and on June 25, 1798, was dedicated to the public by resolution of the proprietors as follows:

\* \* \* On motion voted, that the block containing two acres and one-half of land, whereon the court house and gaol are built in said Burlington, shall and is hereby set off for the use of the publick, for the erection of all necessary county and town buildings for public use.

It was further agreed that the square, except that portion covered by the orator's building, and some other portions that were built on from time to time under leases from the town, but long since restored to the public, had ever since been used by the public as a public square and for the erection of necessary public buildings; that the proprietors, at the time they laid out the square, laid out College street on the north of it, Church street on the east, Main street on the south, and St. Paul street on the west; that the lands surrounding the square were sold by the proprietors and built upon at an early day; and that the square was never divided among the proprietors, but remained undivided land. It was also agreed that the " statement of the case " in *Pomeroy* v. *Mills*, 3 Vt. 279 and 410, and *Abbott* v. *Mills*, Ib., 521, might be used as evidence. The testimony on the part of the orator tended to show, that down to 1835 the whole of the square was open, and freely traversed in any direction by teams and people on foot; that about that time the western part of the square was inclosed by a fence, so that an open space about three rods wide, extending from College street to Main street, was left next west of the orator's building and the buildings south of it; that from that time until the commission of the act complained of, the space between the fence and the orator's building and the buildings south of it, had been open and freely traversed by teams and people on foot passing north and south from street to street, and also going to and from said buildings on business, and for any and every purpose ; that that open way was wrought and kept in condition for such travel by the town before the incorporation of the city, and after such incorporation, by the city, the same as other highways and streets; that the eleven-feet strip referred to in the bill was generally taken care of and kept in

condition for the passing of teams thereon by the occupants of the orator's building; that until about 1830 the only public, open, and unobstructed way of approach to said buildings was on the west side, over said passage-way and, to the orator's building, over said eleven-feet strip; that about 1830 Church street was wrought for travel, but that the principal entrances of the orator's building, and other buildings south of it, continued to be on the west side for ten or fifteen years thereafter; and that the west entrances of the orator's building continued to be used by the tenants of the building, and by the public in going to and from the stores in that building as much as the entrances on the east, until the commission of the acts complained of. The testimony also tended to show that the steps on the west side of the orator's building extended several feet on to the eleven-feet strip, and that for thirty-seven years there had been a post standing on the north end of said strip about three feet from the piazza, on the side of the orator's building, but that there never was any fence, or other apparent mark, separating that strip from the rest of the square.

The deed of March 26, 1825, from Thomas to the town, contained the following condition and reservation:

* * * which is to be forever kept open for a public common; saving nevertheless to the said Henry Thomas the right of keeping up and using forever so much of said land as is now used for an open piazza in the manner now used and occupied, to him, his heirs and assigns; and also reserving to the said Thomas the right he now holds in the above land whenever the said town of Burlington shall repossess the land leased to said Thomas lying between his said house and the court house aforesaid.

The orator introduced a copy of a deed from Burlington to said Thomas, dated August 13, 1832, reciting that said town had " become repossessed of the land leased " to said Thomas, and reconveying to him the land conveyed by him to the town by his deed of March 26, 1825. There was also testimony tending to show that the orator had become repossessed of the land leased to said Thomas. The orator also introduced a copy of the record of the proceedings on the indictment of Thomas, from which it appeared that, although the jury found the respondent guilty, no sentence

was ever passed. He also introduced a like copy of the proceedings on the indictment of the orator, from which it appeared that the orator was indicted for erecting and maintaining said buildings and acquitted.

At the September Term, 1876, Chittenden County, the court, PIERPOINT, Chancellor, decreed, *pro forma*, that the defendants and the city of Burlington be perpetually enjoined from placing any curb-stones or other obstructions so as to embrace within the city park enclosure, or exclude carriages or teams from, so much of the premises described in the bill as embraced in the lease to said King, as lay between a line drawn 95 feet west of the west line of Church street and the piazza of the orator's building, and extended south 89 feet from the south line of College street ; and as to the residue,of the relief prayed for, the bill was dismissed with cost.

Appeal by both parties.

*William G. Shaw* and *E. J. Phelps*, for the orator.

The orator is the owner of the land covered by the King lease. Notwithstanding the square, of which it forms a part, was dedicated to public use, both the title of the original proprietors and the public easement in the portion by that lease has been entirely divested and extinguished : First, by continuous adverse possession by the orator and his grantors since 1809, which, by virtue of the Statute of Limitations, is conclusive against the private rights of the original proprietors, and, under the law of Vermont, is equally conclusive against the public title or easement. *University of Vt.* v. *Exr. of Reynolds*, 3 Vt. 542 ; *Townsend* v. *Est. of Downer*, 32 Vt. 204, *et seq. ; Tracy* v. *Atherton*, 36 Vt. 510, *et seq. ; Knight* v. *Heaton*, 22 Vt. 480 ; *United States* v. *Haswell*, U. S. Circuit Court, Dist. of Vt. 1847 ; *Johnson* v. *Ireland*, 11 East, 279 ; *Parker* v. *Baldwin*, 11 East, 488 ; *Mayor of Hull* v. *Horner*, Cowp. 102 ; *Alves* v. *Henderson*, 16 B. Mon. 131, 172 ; *Rowan* v. *Portland*, 8 B. Mon. 232 ; Washb. Easm. 211, 599, 640 ; *Funkhouser* v. *Lengkoff*, 26 Mo. 453 ; *Beardslee* v. *French*, 7 Conn. 125 ; Gen. Sts. c. 24, s. 17. Secondly, by the express relinquishment of the public easement by the act of 1808, and

the lease to King, made by the authority of that act. For the
Legislature has complete control of such public rights, and can
release them at its pleasure, so far as the public are concerned.
Dillon Munic. Corp. ss. 518, 519; Stuber's Road, 28 Penn. St.
199; *Stormfelz* v. *Turnpike Company*, 13 Penn. St. 555; *Gray*
v. *Iowa Land Company*, 26 Iowa, 38; *Reading* v. *Commonwealth*,
11 Penn. St. 196; *Bailey* v. *Railroad Company*, 4 Harring.
(Del.) 389; *Clinton* v. *Railroad Company*, 24 Iowa, 455. Such
is not only the general law of the land, but it is the law of this
piece of land and this building, as pronounced in *State* v. *Thomas*,
Chittenden County Court, March Term, 1833, and *State* v. *Strong*,
Chittenden County Court, September Term, 1875. The Legisla-
ture released this public right to King on valuable consideration.
Thirdly, the defendants are estopped from denying the orator's
title, by the verdicts in the last named cases. They are virtually
the party there represented by the State.

It is not necessary for the orator to vindicate his title to the
other piece of land, because, if he owns only the piece covered
by the King lease, he has a right to the relief sought. But his title
to that piece is fully established by all the considerations urged in
regard to the other except the act of 1808.

The tract of land west of the orator's property was in fact a
highway, which the city had no power to convert into a park, but
which could cease to be a highway only through a regular discon-
tinuance. Gen. Sts. c. 24, ss. 1, 22, 44, 74; Charter of Bur-
lington, 1872, s. 9. Such use of the land is in exact accordance
with the language of the proprietors' vote of 1798. And such
use, long-continued by the public, was an acceptance and appro-
priation of the land set out by the proprietors for the public use
of a *highway;* and is not the purpose of the dedication thus char-
acterized and fixed? *State* v. *Trask*, 6 Vt. 366, *per* PHELPS, J.

The town and the city, by repairs, &c., made themselves liable
for any injuries that might result from its insufficiency. The
duty to keep it in repair as a highway, implies the right of the
public and individuals to use it, and have it continued, as a high-
way until regularly discontinued. The town could have laid a
highway across that tract; but the way across it has become one

through the way in which the donors and the authorities have dealt with it.   *Pott* v. *School Directors*, 42 Penn. St. 141.   The vote of 1798 was not in itself a dedication.   *Abbott* v. *Mills*, 3 Vt. 528.   Therefore, the mode of use of the land is of the utmost importance in indicating for what purpose it was set out.

By the lease of a portion of the square, *with the appurtenances*, King took the right of way to and from his premises over the square.

By continuous use for more than sixty years by the orator and his grantors of the tract of land in question as a means of approaching and departing from his building by all modes of travel, the orator has acquired a right to such use, and the municipality has no power to deprive him of it, even for the benefit of the public, without adequate compensation.

The strip of land lying west of the piazza of the orator's building is clearly the orator's private property.   It was part of the King lease, and up to the quit-claim deed thereof by Thomas to Burlington, the title of King and his grantors to it cannot be questioned.    But Thomas's deed was only a conditional deed ; and if that deed was a dedication to the public, it was only a conditional dedication.    And upon happening of the event which was to terminate it, the land was reconveyed to Thomas by the town.    That was conclusive of the *quasi* dedication.    *Conkling* v. *Springfield*, 39 Ill. 98.    The expression in Thomas's deed to the town, that the piece of land was to be forever kept open for a public common, was not in itself a limitation of the land to that use.    *State* v. *Woodward*, 23 Vt. 92 ;   *Rawson* v. *School District*, 7 Allen, 125.    Besides, it cannot be claimed that Thomas's intention was to create a park that the town authorities could close up at pleasure, and thus entirely cut off access to his hotel with wagons and stages.    But as the town has reconveyed to Thomas, its highway authorities cannot question the validity of the reconveyance.    The recital in the deed to Thomas, that the town has become repossessed of the land leased by it, estops the defendants from denying that fact.    *Coleman* v. *Evans*, 2 Otto, 489 ;  *Marcy* v. *Oswego*, 2 Otto, 638 ;   *Co. of Leavenworth* v. *Barnes*, 4 Otto, 70 ;  *Douglass Co.* v. *Bolles*, 4 Otto, 104 ;  *Johnson Co.* v. *January*,

4 Otto, 202. Thomas and the orator have owned the strip, and have claimed to own it, since 1832, and the orator has kept it in repair, and used it as he has had need. He has done with it everything that the owner of property thus situated would naturally do. The fact that the public could and did pass over it more or less, has not deprived him of his ownership, nor made it a highway or common, because there has been no *intention* on his part to relinquish his ownership and dedicate it to the public, but the reverse; and without an intention to dedicate, there can be in such cases no dedication. But could a dedication be presumed from the fact that the orator has allowed the public to pass over the land in teams and vehicles, it would be a dedication for the purpose of keeping it open for teams and vehicles, not for the purpose of having them excluded, as the defendants propose to do. *Morse* v. *Ranno*, 32 Vt. 600 ; *Plimpton* v. *Converse*, 44 Vt. 158 ; *Green* v. *Chelsea*, 24 Peck, 71 ; *North* v. *Dawson*, 1 Sneed, (Tenn.) 59 ; *Holdane* v. *Cold Spring*, 21 N. Y. 477 ; *Irvin* v. *Dixion*, 9 How. 10 ; *Kilburn* v. *Adams*, 7 Met. 33 ; *British Museum* v. *Fennis*, 5 C. & P. 460.

The remedy by injunction is the proper one in regard to the proposed obstruction of the highway. High Injunctions, ss. 519, 521, 528 ; Hilliard Inj. 572; *Ewell* v. *Greenwood*, 26 Iowa ; *Craig* v. *People*, 47 Ill. 487 ; *Langdale* v. *Bouton*, 12 Ind. 467. And also for the threatened conversion of the eleven-feet strip into an enclosed common, and the exclusion of the orator from acts of ownership thereon. Hilliard Inj. 345; *Carpenter* v. *Gwynn*, 35 Barb. 395 ; *Holdane* v. *Cold Spring*, 21 N. Y. 477 ; *Gilbert* v. *Arnold*, 30 Md. 29. The injury to the orator in either case is irreparable.

The orator should recover costs, whether he obtains both injunctions or only one.

*L. L. Lawrence* and *Daniel Roberts*, for the defendants.

The quantity of land appropriated by vote of the proprietors shows that a public common, as well as a place for public buildings, was intended. HUTCHINSON, C. J., in *Pomeroy* v. *Mills*, 3 Vt. 413 ; *Pomeroy* v. *Mills*, Ib. 279, 410 ; *Abbott* v. *Mills*, Ib. 521.

The dedication was to the public, not to the town of Burlington. The fee remained in the original proprietors. REDFIELD, J., in *Beach* v. *Haynes*, 12 Vt. 15 ; *Pomeroy* v. *Mills, supra; Abbott* v. *Mills, supra.*

The dedication was accepted by the public. The whole square, where not actually obstructed, may be called a highway. PRENTISS, J., in *State* v. *Wilkinson*, 2 Vt. 480, 487 ; *State* v. *Catlin*, 3 Vt. 530 ; *State* v. *Atkinson*, 24 Vt. 448 ; WILLIAMS, C. J., in *Hutchinson* v. *Pratt*, 11 Vt. 402, 423 ; Dillon Munic. Corp. s. 509 and note. But it is said that as the carriage-way made by fencing the square was, to some extent, kept in repair by the proper authorities of the town and city, it thereby became a highway *for carriage travel*, beyond power of recall for a more limited use. The answer to that claim is easy. Doubtless the town was liable to the traveler for insufficiency of that way, so long as it remained open for use. Hence it was kept in repair. *Goodrich* v. *Colchester*, Chittenden County, December Term, 1855 ; *Ozier* v. *Hinesburgh*, 44 Vt. 220 ; *Whitney* v. *Essex*, 42 Vt. 520., The whole square was, in a large sense, a highway ; but having been dedicated " to public use," not as a highway for travel exclusively, but rather as " a public common," such change may be made in its use as the changing needs of the public may require. It was not in the power of the town authorities to bind the successive representatives of the public interest to any particular or special use of that part of the square ; least of all, to give to individuals any special rights therein. *Pomeroy* v. *Mills* and *Abbott* v. *Mills, supra.*

The question is not between the orator and the city, but between the orator and the public. The power and duty of protecting the public interest in the matter is in and upon the city council. Acts of 1872, No. 255 ; Acts of 1874, No. 170 ; *Hutchinson* v. *Pratt*, 11 Vt. 402. The State is the guardian of the public interest as to dedications to public use. *State* v. *Wilkinson*, 2 Vt. 480 ; *State* v. *Catlin*, 3 Vt. 530 ; *State* v. *Trask*, 6 Vt. 355 ; *State* v. *Woodward*, 23 Vt. 92 ; *State* v. *Atkinson*, 24 Vt. 448. The State never gave the park in charge of the selectmen of the town, nor to the town as a corporation, and hence, they had no power over it to stamp upon it any use narrower than the

48

terms of the dedication, for, the town officers, as such, had no authority beyond the care and protection of the public interest. Thus there was never any such public highway, even as to the town, that the town or city council could not at any time have closed without a formal discontinuance. But to have laid out a public highway, such as the orator claims, would have been in derogation of the terms of the dedication. It follows that it could not have become such highway by prescription. *Langley* v. *Gallipolis*, 2 Ohio St. 108; *Commonwealth* v. *Alburger*, 1 Whart. 469. To say that the carriage-way had become a highway by prescription, in the narrow sense claimed by the orator, is to say that the public may prescribe against itself—may acquire a right as against its own right. It is essential to a possession that may grow into a prescriptive right, that it be *adverse*. But here was no adversary party against whom to make claim, for the public represented all interests, except that of the original proprietors. Again, possession is always to be referred to the party's claim of right. Here it is to the proprietors' vote that the use of the carriage-way must be referred. *Smith* v. *Higbee*, 12 Vt. 113; *Rogers* v. *Bancroft*, 20 Vt. 250; *Ford* v. *Flint*, 40 Vt. 382.

The orator's case is, that in front of his premises there is a carriage-way, connecting two streets, furnishing him convenient access to his premises with teams, which the city council threaten to close and devote to a more limited use, which he claims to be a public highway for teams and carriages. Suppose it to be so. The offence of closing it is a public offence, and the remedy is by proceedings in the name of the State. The orator has no such separate interest as entitles him to prosecute for the obstruction. High Inj. ss. 521–2. Again, the attempt at obstruction was by the street commissioners, acting under vote of the city council. An injunction does not lie in such case. High Inj. s. 404. If it was a highway, the street commissioners had authority to discontinue it. Nor would the orator be entitled to damages therefor, because he has no individual interest in the question. *Dalrymple* v. *Whitingham*, 26 Vt. 345. The fact that the discontinuance was not in common form does not make an injunction the proper

remedy. This was not a case for a formal discontinuance; for the alleged way had never been laid out as a highway. Besides, the use of it as a carriage-way was not inconsistent with the rights of the public in the land as a public square. To have discontinued it as a highway, would have left it as a highway still, under the dedication.

Again, the orator claims a private way. That claim is inconsistent with the former, for there cannot be a private right of way in a public highway. Washb. Easem. 138, 217 ; *Dodge* v. *Stacy*, 39 Vt. 558 ; *Thomas* v. *Marshfield*, 13 Pick. 249. Besides, the orator's use of it was in kind, only such as that of the whole public. His ownership of the adjoining land gave him no exclusive right in the way. REDFIELD, C. J., in *Hatch* v. *Vt. Central R. R. Co.* 25 Vt. 62 ; *Richardson* v. *Vt. Central R. R. Co.* 25 Vt. 465. The orator claims a private way by grant under the lease to King, which conveyed the land " with the appurtenances." The lease uses those words, but the act authorizing the lease does not. The selectmen had no authority to contract beyond that given in the act. But that way was not then appurtenant to the land leased. There is no evidence that it had been used as such. Sufficient time had not elapsed to create a prescriptive right, even if possible to be created by prescription. He also claims a private way by prescription or grant presumed. In addition to what has been said it may be added, that neither the Statute of Limitations nor a prescription runs against the public. Gen. Sts. c. 25, s. 65 ; Dillon Munic. Corp. s. 520, *et seq. ; Penn. Pot Landing* v. *Philadelphia*, 16 Penn. St. 79 ; *Philadelphia* v. *Railroad*, 58 Penn. St. 253 ; 18 N. J. Eq. 311. A grant cannot be presumed from a possession however long, when not adverse ; nor where there exists no power to make a grant ; nor where the right claimed could not have had a legal origin. *University of Vt.* v. *Exr. of Reynolds*, 3 Vt. 542 ; *Victory* v. *Wells*, 39 Vt. 488 ; 2 Washb. Real Prop. 296, 302. *Knight* v. *Heaton*, 22 Vt. 480, was rightly decided on false argument.

As to the eleven-feet strip. The selectmen had no power, even under the act of the Legislature, to give title by the lease to King. *Abbott* v. *Mills*, 3 Vt. 521, 529 ; *Le Clercq* v. *Gallipolis*, 7 Ohio,

218; *Warren* v. *Lyons*, 22 Iowa, 357. But at any rate the lease should not be held to operate upon land not covered by the building, since the public were never excluded from the eleven-feet strip, but have ever since used it as before. This is not the case of one's throwing open his own land for his own convenience, as in *Morse* v. *Ranno*, 32 Vt. 600 ; but the case of an attempt to acquire a right as against the public, and extends no further than the interference with the public use. Fifteen years' use by the public would give a right as against the lease. *Morse* v. *Ranno*, *supra*. So also, *user* by the public, and *non-user* by King and his successors, should be treated as an abandonment of their claim. *Knight* v. *Heaton*, 22 Vt. 480. This strip and all land west of it was dedicated to the public, " to be forever kept open for a public common," with a certain limitation as to the piazza, by Thomas's deed to the town. That dedication, accepted by the public, was irrevocable by the parties to the deed. Washb. Easem. 188. The so-styled reservation in that deed would seem to be void as being inconsistent with the grant. If not void, then the dedication was limited only as to time, and determinable only by the act of the town in repossessing itself of the land leased to Thomas ; and the town never has repossessed itself of that land. ﹒2 Sm. Lead. Cas. [204.] Again, the town never authorized its selectmen to make the reconveyance to Thomas. Besides, the release is in terms only a release of the town's interest, which could be nothing more than its interest as trustee for the public. The *cestui que trust* remains, and the estate remains. At most, such conveyance would work only a change of trustees, and Thomas would hold as trustee for the public, and the orator as his successor.

The opinion of the court was delivered by

BARRETT J. The record of the indictment and verdict in the case of *State* v. *Thomas*, in 1832, and of *State* v. *Strong*, in 1875, establishes that the occupancy of the land covered by the buildings, for 89 feet north and south, and as far west as the buildings extend, is rightful. It settles the question of their title, and that it had been acquired in some authentic way. The ground of that

title, as claimed, is the lease to King, which lease embraces the land on which the buildings stand, and eleven feet in continuance west of the piazza of the building.  The question now is, whether Strong has got title to that eleven feet, as against the right of the city or of the public, asserted by the city authorities, to exclude him from such use of it as he has hitherto had.

The evidence shows that it had been occupied as an approach to the buildings of Strong 'throughout the whole period, down to the time of the action of the city authorities that gave occasion for this bill, and occupied in such a way as to evince a claim of right to such occupancy.  There had been no use by the public interrupting such occupancy, or indicating a denial of the right of such occupancy in Strong and Thomas.  That occupancy was such as the character and situation of the property rendered proper, and necessary, and such only as could have been made of it in order to serve the beneficial and necessary purpose of its use by the owner.  It was as exclusive as it could be ;  and the use by the public was not only consistent with the claim and occupancy by Strong and Thomas, but was mainly a use in furtherance of the purpose of the occupancy by them under the right as claimed.  That use by the public, as shown, was in going to and from the buildings on the connected territory, for the purpose and by way of participating in the business carried on in those buildings and in patronage of that business.  That use by the public, therefore, was rather in co-operation with the proprietors of the buildings and business, and tended to the establishment of an easement in such proprietors, rather than an adversary right against them.  These views are so fully established and illustrated by the cases as to render citation or discussion needless.

On the other hand, we think there has been no use next west of that eleven feet which changes the character of the land from that for which it was dedicated by the original proprietors.  The claim by the orator is, that it has become a highway in the technical sense, and so must continue to be such, with all the rights of the public to use it as such, until discontinued in the mode prescribed by the statute.

The use of it has been as consistent with its character as a

common as with the character of a highway. There is no ground for claiming that it assumed at all the character of a highway till after a portion of the square had been fenced in. After that fencing, the part outside the fence continued to be used just as it had been used before. As it had been and continued to be open, and free for passing over with all sorts of teams as well as on foot, at all times of day and night, between the public established highways around it, it was needful for the town to see to it that it was reasonably safe against accidents so far as its surface and condition were concerned, much the same as was held in the case of *Ozier* v. *Hinesburgh*, 44 Vt. 220.

Aside from that claim as to the orator's rights as in a highway, the only other ground of claim by him as against the doings of the city authorities is the use by him as against the public. That use by him has not been adverse to the use of the territory by the public as a common in distinction from a highway. The title and right of the public, by the dedication of the proprietors, were of a public common. That title and right still remain, unless lost by adverse use.

This point stands upon the same ground and view as the former one, on which we accord to the orator his right to the eleven feet, namely, that such use as he had had of it was effectual against the right of the city authorities to prevent such use. For similar and equal reason, we hold that the public have the right to appropriate what is west of him to the purposes of a public common, as against his right to prevent its being done.

The decree is affirmed, as by the mandate sent to the Court of Chancery.