WILLIAM PITT FIFIELD'S ADMRX. *v.* TOWN OF ROCHESTER.

February Term, 1915.

Present: MUNSON, C. J., WATSON, HASELTON, POWERS, AND TAYLOR, JJ.

Opinion filed October 11, 1915.

*Evidence—Death—Life Expectancy—Mortality Tables—Towns —Highways and Bridges—Action for Injuries—Duties of Towns—Construction of Declaration.*

The American Experience Mortality Tables, though made up from selected lives, are admissible on the issue of the life expectancy of a decedent who had been a sufferer from asthma.

In an action against a town for the wrongful death of plaintiff's intestate, who was thrown from a pair of sleds because of an alleged defect in the approach to a culvert in a public highway, *held,* under the evidence, that the question whether the town has so abandoned the culvert, by diverting the water, as to make the town no longer liable because of the condition of the culvert, was for the jury.

In an action against a town for the wrongful death of one who was thrown from a pair of sleds because of an alleged defect in the approach to a culvert in a public highway, *held,* under the evidence, that whether the defect in question was in the "approach" to the culvert, and, if so, whether that defect was the cause of the accident, were questions for the jury.

A town is liable for injuries resulting to a traveler solely from a defect in the approach to a culvert in its public highway, which it knew, or ought to have known, in season to remedy, regardless of the quality or origin of that defect.

A declaration alleging the existence of a culvert as a part of a public highway, and the duty of the town to maintain it "in good and sufficient repair for the safe passage of travelers thereon," that on the day named "the said culvert was not in good and sufficient repair, and suitable for the safe passage thereon, and over said culvert, and the approaches thereof, by travelers, but on the contrary the said culvert and the approaches thereof were insufficient and out of repair" owing to designated causes, in consequence of which "a large hole or depression in the traveled part of said highway adjacent to said culvert and in the westerly approach thereof was washed out," and plaintiff's intestate was thrown from his sleds and killed, is drawn on the theory that the alleged defect was in the westerly approach to the culvert.

CASE for negligence. Plea, the general issue. Trial by jury at the June Term, 1914, Windsor County, *Miles, J.*, presiding. Verdict and judgment for the plaintiff. The defendant excepted. The opinion states the case.

*W. B. C. Stickney* and *John Sargent* for the defendant.

*Wallace Batchelder* and *William Batchelder* for the plaintiff.

WATSON, J. This is an action on the case, brought by the administratrix for the benefit of the widow and next of kin, by reason of the death of William Pitt Fifield, the intestate, who died December 15, 1913, from the result of injuries received by being thrown from a load of hay, while traveling on an open public highway in the town of Rochester, on the eleventh day of the same month.

The intestate at the time of his injury was fifty-nine years of age, had resided in this State eleven years, was a farmer, and a hard working industrious man. Some years ago when living in the State of New York, he had the asthma, and had some little attacks of it after he came to Vermont to reside, but it did not amount to anything after a while, and during the last two years of his life he did not have it at all. Henry Holt, a witness called by plaintiff, testified that he was chief clerk in the actuary department of the National Life Insurance Company; that the table known as the American Experience Mortality Table was

made up from the experience of seventeen British actuaries, and is adopted as a safe standard of operation as to life expectancy in this country, and is in use among life insurance companies: that it is based upon the supposition that the man whose age is given and whose expectancy of life is being computed is of sound health at the beginning of the period, and that it is used for the purpose of determining the expectancy of life of persons in sound health only. Subject to exception, the witness was asked the question, "Without regard to any hypothesis on which you base your judgment of any particular case, what is the average probable duration of life of a man fifty-nine years of age as shown by your tables?" and answered, "14.78 years." It is argued that it was error to permit evidence of observations of the duration of life in healthy men, in this case where the man was shown to have been afflicted with the disease mentioned.

The Carlisle Table of Mortality, based upon two enumerations (in 1780 and 1787) of the population of the parishes of St. Mary and St. Cuthbert, Carlisle, England, (13 Encyc. Brit. 9th Ed. 169,) is generally recognized as proper evidence on the question of expectancy of life, and by some courts of high authority it has been judicially noticed when not introduced in evidence. *Lincoln* v. *Power,* 151 U. S. 436, 38 L. ed. 224, 14 Sup. Ct. 387. In *Camden & A. R. Co.* v. *Williams,* 61 N. J. L. 646, 40 Atl. 634, that table was held to have been properly received in evidence, irrespective of the condition of health of the deceased, for it is not a table compiled from statistics of selected lives only; but such condition had to be taken into account. A similar holding was had in *Moses* v. *Mathews,* 95 Neb. 672, 146 N. W. 920, Ann. Cas. 1915 A, 698. The American Experience Mortality Table, on the contrary, is based upon statistics of selected lives, that is, insurable persons. Yet we do not think this difference renders the latter improper evidence on the probable duration of life, in a case where the person was not of insurable condition. Like the Carlisle Tables, it is not conclusive, and must be considered in connection with evidence showing the condition of the person's health, his habits of life, and any other circumstance having a legitimate bearing upon the question. In a recent case before the court of last resort in Kentucky, where the American Table of Mortality was used, the court said: "Such tables show only the probable continuance of life, and not the duration of ability to earn money. They show the probable duration of life of

healthy persons who are insurable risks, and the court, when re-quested, should tell the jury what the table shows, and that it is to be considered by them, in connection with the other proof in the case, for what it is worth, considering the plaintiff's state of health and circumstances, in determining the probable dura-tion of his capacity to earn money.'' *Illinois Central Ry. Co.* v. *Houchins,* 121 Ky. 526, 89 S. W. 530, 1 L. R. A. (N. S.) 375, 123 Am. St. Rep. 205; *Mills* v. *Catlin,* 22 Vt. 98; *Gordon* v. *Tweedy,* 74 Ala. 232, 49 Am. Rep. 813; *Hunn* v. *Michigan Cen-tral R. R. Co.,* 78 Mich. 513, 44 N. W. 502, 7 L. R. A. 500; *Schell* v. *Plumb,* 55 N. Y. 592; *Vicksburg & Meridian R. R. Co.* v. *Putnam,* 118 U. S. 545, 30 L. ed. 257, 7 Sup. Ct. 1; *Pierce* v. *Tennessee Coal, I. & R. Co.,* 173 U. S. 1, 43 L. ed. 591, 19 Sup. Ct. 335.

Defendant excepted to the overruling of its motion for a directed verdict, on the ground that there was no evidence to support the plaintiff's claim. Exception was also taken to the submission of the case to the jury, on the ground that there was nothing in the evidence to warrant it.

It appeared from the evidence that on the eleventh day of December, 1913, the intestate was passing over the public high-way in question, driving a pair of horses hitched to a bob-sled loaded with hay; that he was standing on top of the hay near the forward end of the load and a little to the right of the binder, and as the forward sled passed off from what was formerly (at least) a culvert across the road at the place in question, on a down grade, he was thrown off the load to the ground, thereby receiving injuries from which he died four days later; that one Fred Dumas was riding on top of the load with the intestate at the time of the accident, standing up three or four feet behind him, leaning against the pitchforks. Dumas was called as a witness by plaintiff and testified as follows: Q. What first at-tracted your attention? A. Well, sir, we went over as I thought it was a waterbar at the time and the forward sleigh dropped to the off side. Q. Which sleigh? A. The forward sleigh. Q. Both runners, or one? A. One, the off one on the right-hand side. Q. What did you notice about that? A. There was a sud-den drop. Q. Did you see it? A. Yes, sir. Q. What did you see Mr. Fifield do? A. I saw him pitch forward. Q. When was that with reference to the instant the forward sleigh runner dropped? A. Just at the time. Q. And what happened to him

them? A. He went off on to the ground. Q. What did you do? A. I lunged after him; I let go my forks and jumped and tried to catch him, and could not do it and went clear down on to the hay on to my stomach. Q. After you found yourself there, where was Mr. Fifield? A. Down pretty near to the ditch. Q. Where did he land? A. In the ditch, on the off side of the load—the right-hand side. Q. Where with reference to the front of the sled? A. Just off of this drop. Q. Did the sleigh stop? A. Yes, sir. Q. You say there was a hay rack on the sleds, was there anything placed on the hay rack? A. Yes, sir. Q. What? A. Some cross pieces. Q. In what position were they? A. Three of them, one at each end and one in the middle. Q. Did they extend beyond the edge of the hay rack? A. Yes, sir; that was to make the hay rack. Q. Do you know how long the crosspieces were? A. Yes, sir; eight feet. Q. Were they placed so as to extend the same distance either side? A. Yes, sir. Q. Now when you came back to move the hay, did you make any examination of the surroundings there? A. Yes, sir. Q. What if anything did you notice with reference to the forward crosspiece? A. I noticed it was caught in the bank. Q. On what bank? A. On the nigh side of the road. Q. Is that a bank below what you called the culvert? A. Yes, sir. Q. And was there anything done to take the load away from there? A. Yes, sir. Q. What was done? A. Mr. Hanks pushed on the load and Mr. Whittier did. Q. And the team drew it away? A. Yes, sir. Q. How did the surface of the road below the culvert compare with the surface above the culvert on this occasion when you drove down over there—how did the surface of the highway as it leads down to Churchville, compare with the piece of road above the culvert? A. Why, the piece of road below—after you got—just as you went over it there was a hole.

Orrel V. Hanks, another of plaintiff's witnesses, testified that after the accident he helped Dumas in drawing the load of hay away from the place of the accident; that before moving the load, the rear sled was on the stone culvert, and the forward sled was below that point. The tread of the sleds was five feet; from the point of forward sled to bunk of same, four feet and one inch; from point of rear sled to bunk of same, four feet and three inches; and from one bunk to the other, eight feet. Plaintiff's evidence further tended to show that on December 24, thirteen days after the accident, and when the snow had been

swept off, and the condition of the road at the culvert and im-. mediately below it was the same as at the time of the accident, a man in a pung sleigh drove down over that road, traveling on the north side of the road, the sleigh very nearly in the wheel tracks; that as he drove over the culvert, the right-hand runner of his sleigh being about in the north wheel track, "the sleigh tipped right over, nose down, into this place and then came up," throwing the driver forward in the sleigh.

Plans in the case, having actual distances and elevations marked thereon at intervals along the traveled part of the road, showed that the culvert run somewhat diagonally across the road, the southerly end being farther west than the northerly end; that the surface of the road in the north wheel track on the culvert at its westerly side, was 1.10 feet higher than it was two feet farther west, and the same point was 1.72 feet higher than it was four feet farther west, and the same point was 2.18 feet higher than it was seven feet farther west. This depression in the north wheel track immediately west of the culvert was also plainly shown by photographs made exhibits in the case.

It is said by defendant in effect that while it is true that formerly there was a stone culvert across the road at the place in question, it had been abandoned before the time of the accident. In this respect defendant's evidence tended to show that in March, 1913, there was a very severe freshet in that vicinity, by reason of which the culvert failed to carry off all the water coming down in the ditch on the north side of the road, and the ditch along there on that side was washed out deeper, so that the bottom of it opposite the mouth of the culvert was "two or three or four inches below the bottom of the sluice"; that in the spring of that year, when repairing the highway after the freshet, the road commissioner of the town caused a flat stone to be placed against the mouth of the culvert, with the intention of abandoning the culvert and having the ditch remain as it then was, carrying the water past there and further down on that side of the road; that since then the culvert has not been in use, all the water flowing past it in the ditch. The plaintiff's evidence tended to show that after the freshet and after the repairs on the highway had been made, the bottom of the ditch there was about even in height with the bottom of the culvert, and so remained to the time of the accident; that the flat stone was placed only "partially across the mouth of the sluice," one upper corner and one lower

corner of the mouth being unobstructed; that something like two or three inches, or three or four inches of the mouth remained uncovered, and some of the water continued to go through the sluice; and that this is the way the culvert was and the way it was used up to and at the time in question. Defendant's civil engineer and expert witness, H. M. McIntosh, testified in direct examination, to noticing the north end of what had been a culvert, and that the stone set up over it "would evidently stop the main flow, but it was not water tight by any means." There was no evidence that the side walls of the culvert had been taken out, nor that the open space between them had been filled up. Assuming, but not deciding, that a town can be relieved from liability under the statute, by showing an abandonment of a culvert by merely placing a stone or something else over the mouth of it to prevent water running into it, and causing the water to flow past in the ditch by the side of the road, as the defendant's evidence tended to show was done in this instance, the evidence in the case was such as to make the question of absolute abandonment, even in that way, one of fact for the jury.

It appeared that at the time of the freshet mentioned above, a portion of the highway beginning at the westerly wall of this culvert and extending westerly about ten feet, was washed out. Some of the water came into the road above the culvert, and some that went into the culvert at its end, passed through the west wall on the north side of the traveled part of the highway, leaving the wall there as before, "and tore the road out just below the sluice." In repairing the road later, some stone and dirt were put into this hole so made in the road. But the evidence tended to show that, notwithstanding the repairs so made, there was this hole, or sudden depression (more particularly described above) just west of the west wall of the culvert, through which was the north wheel track, as teams generally went in passing over the road; and that the condition of the road there around the culvert at the time of the accident, was as it had been right along. In fact we do not understand that the existence of this claimed defect was seriously controverted, though the extent of it may have been questioned. The defendant's position was and is that the evidence contained nothing fairly tending to show that the fault in the surface of the road, whatever it was, was the cause of the accident; that on the contrary the real tendency of the evidence was that the accident was caused by the in-

testate's driving his team so near the left hand side of the road that his sled struck the bank and stopped there, throwing him off the load to the ground. In addition to the testimony of witnesses Dumas and Hanks that the hayrack hit the bank on the near side, was testimony given by one Spencer, who assisted in taking the intestate home after his injury, that later in the day he went down to the place of the accident and then looked to see what the trouble was; that the tracks of the intestate's sled were plain to be seen—went through into the mud; that below the culvert, the left-hand track was from ten inches to a foot outside of the near wheel track in the road, and the right-hand (north) sled track was nearly in the middle of the road; that the front end of the load was drawn against the bank on the left-hand side.

Dumas was the only witness, in fact the only person then alive, who had personal knowledge of what took place at the time and place in question, and how. In view of his testimony and the other evidence in the case, intelligent and fair-minded men might reasonably differ as to whether the real cause of the accident was the defective condition of the highway, or the hitting of the hayrack against the bank on the left-hand side of the road, and it was for the jury to determine. *Wood v. Central Vermont Ry. Co.*, 89 Vt. 321, 95 Atl. 641.

Involved in the motion for a verdict was also the question as to whether, on the evidence, the claimed defect in the high-way was within the approaches to the culvert, within the meaning of the law. The same question is also raised by exception to refusal to comply with a certain request to charge. It is urged that there was no evidence in the case tending to show that the culvert was ever anything but a walled and covered ditch dug in the natural ground across the road, nor that the surface of the road at that point was ever built up to connect with the structure of the culvert. We may assume that the general features of the culvert when originally built were as stated in argument, and that the surface of the road was never built up to connect with the structure of the culvert, and yet it does not necessarily follow that at the time in question the hole or depression complained of, was not within the approach to the culvert, within the meaning of the law. This culvert was built at a place where the highway runs up and down a hill of more or less grade. At the time of the freshet mentioned, the road

was washed out on the north side of the center of the traveled part, from the west wall of the culvert down for some distance below the culvert. The place so washed out needed to be filled up to the structure of the culvert in order to make the road in good and sufficient condition for travel onto and off the culvert on that side. The evidence tended to show that, though the road was subsequently repaired, it was either done in a way to leave the hole or depression still there, or it soon afterwards formed, rendering the condition of the road unsuitable for travel, and so it remained to the time in question. As the case stood upon the evidence, whether this defect was within the approach, was a question of fact for the jury under proper instructions from the court. *Tinkham* v. *Stockbridge*, 64 Vt. 480, 24 Atl. 761. See also *Herrick* v. *Holland*, 83 Vt. 502, 77 Atl. 6. The motion for a directed verdict was properly overruled.

Exception was taken to the charge in submitting to the jury the question as to whether the culvert was one which the town was bound to keep in repair. As the question was presented upon the evidence, this depended upon whether there had been an entire abandonment by the town, of the use of the culvert as such, and this we have above held was a question for the jury.

Defendant requested the court to charge the jury that to entitle the plaintiff to recover, they must be satisfied by a fair balance of the evidence that the proximate cause of the intestate's injury was a defect in the culvert itself, which allowed the water to flood the highway and wash it out after the repairs which were made in the spring of 1913. This request was refused, and exception saved. The same question is raised by exception to the failure to charge. In ignoring this request, there was no error. It appeared from the evidence that the condition of the road at the time and place of the accident, was just as it had been "right along"—for a long time. In these circumstances, the jury might well find that the town knew, or ought to have known, of the defect in season to remedy it, whatever it was, before the intestate was injured. So regardless of the cause of the defect, if it was within the approaches of the culvert, the town was in duty bound to remedy it, and not doing so, liability attaches for any injuries to travelers in the exercise of due care, proximately caused thereby. *Ozier* v. *Hinesburgh*, 44 Vt. 220; *Campbell* v. *Fair Haven*, 54 Vt. 336; *Brown* v. *Mount Holly*, 69 Vt. 364, 38 Atl. 69.

22

It is argued, however, that the plaintiff's declaration proceeds upon the theory that the town was negligent in maintaining a culvert across the highway in question, insufficient and too small to carry away the surface waters flowing in the ditch beside the road, and that another theory was adopted in the trial of the case.    The first count of the declaration alleges the existence of the culvert as a part of the highway, and the duty of the town to maintain and keep it "in good and sufficient repair for the safe passage of travelers" etc., thereon; that on the day named "the said culvert * * * was not in good and sufficient repair, and suitable for the safe passage thereon, and over said culvert, and the approaches thereof, by travelers * * * but on the contrary thereof * * * the said culvert and the approaches thereof * * * were insufficient and out of repair and unsafe for the safe passing thereon of travelers" * * * that on the day named, the intestate "was passing along and over said highway and said culvert on a loaded sled drawn by two horses, and then and there, solely by reason of the insufficiency in said highway and said culvert and the approaches thereof, caused by the stoppage of the opening or passageway through said culvert, for water to flow through the same from said ditch approaching said culvert as aforesaid, in consequence of which the water in said ditch was thrown through a part of the westerly wall of said culvert, and a large hole or depression in the traveled part of said highway adjacent to said culvert and in the westerly approach thereof was washed out" etc., and the intestate, without any fault or negligence on his part, was then and there violently thrown, etc., and greatly injured.    The second count is not materially different.

We think it pretty clear that the declaration was drawn upon the theory of the insufficiency and want of repair in the westerly approach to the culvert, in that a large hole or depression has been washed out there in the traveled part of the highway, solely by reason of which insufficiency and want of repair, the intestate, a traveler on the highway, was injured.    The record fairly shows that this was the understanding of the court below, and its rulings were made accordingly.    This in effect disposes of all the questions presented by the brief of the exceptor.

*Judgment affirmed.*