# CHARLESTON.

CORA QUINN *v.* B. T. FLESHER *et al.*

Submitted January 27, 1920.   Decided February 3, 1920.

1. EVIDENCE—*Radiograph Not Admissible Until Shown to Have Been Taken So As to Represent Injuries Correctly.*

    Before a radiograph, purporting to show the nature and extent of an injury suffered by a party to a suit, can be received properly in evidence, it must appear that it was so taken as to represent correctly the injured member. This may be shown by the statement of the expert taking the radiograph that he operated the machine so as to produce a correct result, or it may sufficiently appear from other circumstances, such as that treatment was administered for the relief of the injury disclosed by the X-Ray with favorable results.   (p. 456).

2. SAME—*Experts May Testify as to Injuries Shown by Radiograph Where it Has Been Lost and Injured Condition Has Changed.*

    Experts, who have examined a radiograph which it is shown correctly represented an injured condition being inquired about in the trial of a cause, may be permitted to testify as to what the radiograph showed the injured condition to be, without its introduction in evidence, where it appears that the same has been lost and the original injured condition has been changed by medical and surgical treatment as well as the healing processes of nature during the intervening time.   (p. 457).

3. DAMAGES—*Denial of Application for Leave to Take Radiograph of Injury During Trial Not Abuse of Discretion.*

    Where, after the trial of an action to recover damages for injuries sustained from a broken bone has been entered upon, the defendant requests that a radiograph be made of the injured member and the plaintiff is willing that it may be done, it is not error for the court to refuse such request where no reason is given for not having made the same before the trial and it does not appear how long the trial will be delayed by granting such request.   (p. 457).

4. FERRIES—*Proprietor's Duty as to Safe Accommodations for Passengers Stated.*

It is the duty of the proprietor of a ferry to provide adequate accommodations where it usually takes on and discharges passengers and to keep the same in a reasonably safe condition. (p. 458).

5. SAME—*Proprietor Liable for Injuries from Defect in Float Used in Reaching Ferryboat, Though Outside Gangway.*

The proprietor of a ferry is liable in damages to one intending to take passage on such ferry who is injured by falling into a hole in the floor of a barge or float provided by the operator of the ferry by means of which intending passengers reach his ferryboat from the bank of a stream, where it appears that such hole was at a point over which passengers would reasonably be expected to travel in reaching one of the points upon the float at which the boat used for the conveyance of passengers across the stream frequently took on and discharged passengers, and where it was actually taking on passengers at the time of the injury to such intending passenger. (p. 458).

Error to Circuit Court, Cabell County.

Action by Cora Quinn against B. T. Flesher and others. Judgment for plaintiff, and defendants bring error.

*Affirmed.*

*Holt, Duncan & Holt,* for plaintiffs in error.

*W. W. Smith* and *Williams, Scott & Lovett,* for defendant in error.

RITZ, JUDGE:

The defendants are the owners and operators of a ferry across the Ohio River between the City of Huntington, West Virginia, and the town of Chesapeake in the State of Ohio. The plaintiff is now and was at the time of the occurrence giving rise to this litigation a resident of the town of Chesapeake. She, however, worked in the city of Huntington and in going to and returning from her work crossed upon the ferry of the defendants each morning and evening and had been doing so for about seven years before the accident which is the occasion of this suit. During the summer months and in the day time during the winter months defendants used a steam ferry boat in conveying passengers and freight across the river, but after dark during the winter months passengers were conveyed across the river in a

rowboat or skiff. On the West Virginia side of the river the defendants provided a barge or float at which the boat landed and took on and discharged passengers. This barge is some forty to fifty feet in length and access is had to it from the land side over an apron, one end of which rests upon the bank and the other upon the side of the barge. The end of the apron resting upon the bank is not fastened so that it moves up and down the bank as the barge is raised or lowered with the change in the volume of water in the river. This apron is supported by iron rods extending from the end thereof farthest from the barge to the top of posts erected on the barge at either side of the apron, and these posts are in turn supported by rods extending from their tops to a fastening in the floor of the barge near the side farthest from the apron. Between these posts what is called a gang-way, about ten or twelve feet in width, extends across the barge so that vehicles or passengers intending to cross the river go upon the barge by way of the apron and cross the same to the ferry boat moored upon the opposite side. This gang-way is floored over and all of that part of the barge on the lower side of the gang-way is likewise floored at the same level as the gang-way and there is erected on this part a small waiting room for the use of passengers. That part of the barge above the gang-way for a little space next thereto is likewise floored over on the same level as the gang-way, but there is a space at the upper end of the barge which is open. The edge of the barge all the way around except at each end of the gang-way is raised a few inches above the level of the floor by a piece of timber attached thereto. At either end of the gang-way the timber is cut away to the level of the barge floor to enable vehicles to enter or leave the ferry boat by way of the gang-way across the barge without encountering any obstruction. On either side of this gang-way at the end from which the ferryboat is entered is a post used for the purpose of making the ferryboat stationary when discharging or receiving freight or passengers. There is a similar post on the same side of the barge about ten or twelve feet above the upper side of the gang-way and just at the upper end of the floored space. As before stated, plaintiff crossed the river on this ferry twice a day practically every day using the steam ferry boat for the purpose except on Saturday evenings during the winter

months, when her work kept her until after the steam ferry boat ceased running, making it necessary for her to cross the ferry on these occasions by means of the skiff or row boat.

On Saturday, March 22, 1919, after plaintiff was relieved from her work, she, accompanied by her father, went to the ferry of the defendants for the purpose of crossing the river to her home. She says, and in this she is corroborated by her father and other witnesses, that when she approached the barge coming down the river bank she noticed the skiff taking on passengers. She called to give notice to the man operating the skiff of her approach and accelerated her pace so as to reach the skiff before it started across the river. When she got upon the barge she noticed that the skiff was not moored at the opposite end of the gang-way but was taking on passengers from the side of the barge above the gang-way. In order to reach it she stepped under the iron rod extending from the post which is erected for the support of the apron above referred to, and just as she changed her course and made the first step her right leg went into a hole in the floor which it appears was about four inches wide and ten inches long and was caused by a piece being broken out of one of the boards constituting the floor. It appears that the iron rod extending from the top of the post above referred to to the floor was higher than the plaintiff's head at the point where the hole is in the floor. Plaintiff says that the floored space on the barge above the gang-way upon which she was entering when she fell into the hole was habitually used by those waiting to cross the river, and that the skiff used at night during the winter months was frequently made fast to this upper end of the barge and there discharged and took on passengers, and in this she is corroborated by many witnesses, and little, if any, effort is made to contradict this evidence. It is not contended that the skiff was not taking on passengers from the barge at a point above the gang-way at the time plaintiff was injured while attempting to reach it, but it is shown that when the skiff reached the barge on this trip it landed at the gang-way and the operator of the skiff tried to hold it there by catching the post with his hand, but his hold was broken because of the hurry of the passengers in getting in, and because of an eddy at this point, when the skiff was again brought in contact with the

barge it was at a point above the gang-way and here the balance of the load was taken on and this was the point at which it was stationed at the time the plaintiff entered upon the barge.

The plaintiff, being unable to extricate her leg from the hole in the floor by reason of the fact that it was wedged therein very tight, was assisted by her father and another man who was also desiring to cross the river. They then went into the little waiting room to wait for the next trip, the skiff having become fully loaded so that there was not room for them on that trip. They crossed the river on the next trip and plaintiff was assisted from the skiff to the top of the bank by her father and another man, one of them supporting her on either side, from which point she was taken to her home in an automobile. She says that when she fell into the hole her leg became numb and of little use to her but after reaching home the pain became more acute and was relieved, to some extent, by hot applications. The next day she went to Sunday School in the morning and to church in the evening, but she says she was unable to walk on either occasion, being supported by her father and uncle, one on each side of her. The pain becoming more intense on Monday morning she sent for a doctor who after making an examination, advised that the hip had been injured and directed her to go to bed and stay there until the condition was improved. This she did, but this doctor finding no improvement in her condition on the second day after he was first called, advised her to go over to Huntington and have an X-Ray examination made with a view of determining the nature and extent of the injury. She was taken in an automobile to the hospital of Dr. J. A. Guthrie who made an examination of the injured hip and found some kind of disability to exist. He took her from his hospital to the office of Dr. Pepper, an X-Ray expert, where a plate was made of the injured member after which she was sent to her home. When the X-Ray plate was developed Drs. Guthrie and Pepper examined it and determined from the information received from the plate and from the examination made of the injured leg, that there was a fracture of the hip bone. Dr. Guthrie thereupon advised Dr. Martindall, who lived near the plaintiff, of the conclusions reached by Dr. Pepper and himself and directed the treatment to be administered. This treatment

required plaintiff to remain in bed on her back for five weeks with a ten pound weight suspended from her right leg. At the expiration of this time it was found that she had made a reasonably good recovery, although the right leg is half an inch too short and the joint somewhat stiff, as a result of which she limps to some extent in walking. She thereupon brought this suit to recover damages upon the theory that defendants were negligent in permitting the hole into which she had fallen to remain in the floor of the barge. A trial resulted in a verdict and judgment in her favor for $4,750.00, to review which this writ of error is prosecuted.

The first reason assigned for reversing the judgment and setting aside the verdict is that the court below erred in permitting Drs. Pepper and Guthrie to testify as to what the X-Ray picture disclosed to them, the picture itself having been lost. It appears that after the picture was taken by Dr. Pepper and examined by him and Dr. Guthrie it was mislaid and at the time of the trial, although thorough search was made for it, it could not be found. Notwithstanding this loss of the picture, these doctors were permitted to testify that it disclosed a fractured hip bone. The defendants insist that this was error: First because it was not shown that the picture was so taken as to represent correctly the object sought to be photographed; and, second, because the picture itself being secondary evidence and it being lost, no testimony could be offered based upon a view of it. It is quite true that before a radiograph can be used as evidence it must appear that it was so taken as to represent correctly the object reproduced. Of course, it is not meant by this that some one must testify that it is in fact a correct representation. Manifestly this would be impossible for the reason that the object thus photographed is not visible except with the aid of the X-Ray machine. What is meant, is that it must appear that the machine was so placed and operated as to reproduce correctly the object brought within the radius of its activity. Nor need this necessarily appear by a direct statement of the operator to this effect although it may be, and ordinarily is, shown in that way. It may, however, as well be shown from a detail of the circumstances. In this case, Dr. Pepper who took the radiograph, is shown to be an expert with large

experience in this work.   The picture was taken with a view of determining the nature and extent of the plaintiff's injury with a view to treating  the same and treatment was  administered for  the  relief  of  the  injury,  which  the  X-Ray  disclosed, with favorable results.   This injury may not prove absolutely that the plaintiff was injured as disclosed by the radiograph, but the fact that the injury sustained by her responded to the treatment ordinarily administered for the relief of an injury such as that shown by the X-Ray is, to say the least, very strong evidence that her injury was actually of that character, and sufficiently authenticates the picture to justify its admission in evidence.

Could the doctors who examined this radiograph testify as to what it indicated?   It is contended that the bones themselves are the primary evidence, that the picture, if in existence, is secondary evidence, and that the statements of the doctors in regard to it are tertiary evidence or knowledge derived only from a view of secondary evidence.   The object sought to be reproduced was the condition of the bone in plaintiff's hip.   This condition no longer exists and of course it cannot be exhibited. It was shown by the radiograph, which is likewise lost and the question is, was it proper for these two doctors to testify as to what the picture indicated.   It seems to be very generally held that where the original of a document is lost, a copy made from a copy may be introduced in evidence upon a showing of the correctness of the first copy and the loss thereof.   17 Cyc. 517.   It is the best evidence obtainable.   In this case, if we treat the radiograph as but a copy of the then existing condition, we have the original, which was the condition of the bone at the time lost by a change in the conditions due to lapse of time and the treatment administered, the only reproduction of that condition is lost, and the best evidence obtainable as to what condition actually existed at that time is the impression made upon the minds of the two doctors from their examination of plaintiff's hip and the radiograph thereof.   It was not error to admit this evidence.

After the trial of the case had been entered upon the defendants requested the court to permit an expert of their selection to take an X-Ray picture of plaintiff's hip joint, in the presence

of plaintiff's expert, or to permit them to have such radiograph taken by plaintiff's expert in the presence of an expert to be selected by them. The plaintiff at first declined to permit this to be done, but subsequently, and before the taking of evidence was concluded, she expressed her willingness to comply with the request of the defendants. The court, however, refused to suspend the trial and declined the request. This is assigned as error. In the case of *Perkins* v. *Traction Co.*, 81 W. Va. 781, we reviewed some of the authorities upon the question of the defendant's right to have a physical examination of the plaintiff in a personal injury case and there concluded that even were the right conceded it may be granted or withheld by the trial court in the exercise of a sound judicial discretion. The defendants here do not give any reason for not having made this request before the trial, nor does it appear how long it would have been necessary to suspend the proceedings to permit the picture to be taken. In the absence of a showing that would indicate that the granting of the request would probably result in obtaining evidence of some value and of a satisfactory reason for not having seasonably made the request, as well as a showing that the trial would not be unduly delayed, the court did not abuse its discretion in refusing this request.

The remaining grounds urged for reversal are all comprehended within the one assignment, that the evidence does not justify the verdict. The defendants contend that when the plaintiff went off of the gang-way as marked by the posts and the iron rods above referred to, and by the cutting away at each end of the gang-way of the timber which projected above the floor of the barge, they were under no duty to provide for her safety. It cannot be doubted that a passenger has a right to assume that the platform over which the carrier invites him to pass is reasonably safe for the purpose. The passenger is under no obligation to look for defects before proceeding to use the means provided by the carrier for his convenience. This duty of the carrier extends to other parts of the platform than that lying directly between the entrance thereto and the place intended for passengers to board the vehicle. 3 Hutchinson on Carriers, sec. 1207; *Barker* v. *Ohio River R. Co.*, 51 W. Va., 423; 4 R. C. L. Title "Carriers," sec. 641. The evidence in this case abun-

dantly shows that persons waiting to cross the ferry habitually used the part of the barge where plaintiff was hurt; it is further shown that the defendants frequently, when using the skiff, discharged and received passengers at this point and this was being done at the very time at which plaintiff was injured. This was a direct invitation to her to use this part of the barge to reach the boat which was then taking on passengers, and she had a right to believe that the same was in reasonably safe condition. The authorities cited and relied upon by counsel for defendants are without application to the facts here shown. They simply hold that where there are two ways or methods by which a servant may perform his duty to the master, one of which he knows to be safe and the other dangerous, and he selects the latter, he will be guilty of contributory negligence. It does not appear that the plaintiff in this case had any knowledge that the way she was going was unsafe. The way used by her was the one most convenient to reach the point at which the defendants' boat was receiving passengers and this being so she had a right to believe that the defendants had performed their duty and that it was in a reasonably safe condition.

There is no error in the judgment of the circuit court and the same is affirmed.

*Affirmed.*