(No. 6049. November 3, 1933.)

HENRY F. REINHOLD, Respondent, v. H. D. SPENCER, Appellant.

[26 Pac. (2d) 796.]

Merrill & Merrill, for Appellant.

Kenneth Mackenzie and Chase A. Clark, for Respondent.

PER CURIAM. — Appellant, a physician and surgeon, undertook to treat respondent, who was suffering with acute pneumonia, and in the course of treatment it became necessary to perform an operation known as "tapping the lungs." Appellant, assisted by a nurse, performed the operation, using novocaine by means of a hypodermic syringe to deaden the pain. A small opening was made in the pleural cavity of respondent to permit drainage of pus accumulated therein. The usual treatment seemingly was followed by inserting a tube into the cavity through the small opening to provide drainage. The operation was scientifically and properly performed and the wound healed normally. An X-ray examination, conducted at the Veteran's hospital, later dis-

closed a hypodermic needle lodged within the thoracic cavity of respondent. An effort by surgeons at the Veteran's hospital to remove the needle was abandoned as being too dangerous to respondent's life. Subsequent to the disclosure of the hypodermic needle respondent brought this action charging appellant with carelessly, negligently and unskillfully handling a hypodermic needle inserted in the thoracic cavity of respondent in such a manner as to allow the said needle to become detached from said syringe, and knowingly, carelessly, negligently and unskillfully leaving said needle in the thoracic cavity of respondent's body, and carelessly, negligently and unskillfully failing to remove the same, and carelessly and negligently failing to inform respondent of his condition and discharging him as cured. From a judgment for respondent and an order overruling a motion for new trial this appeal is prosecuted.

Numerous errors are assigned which we will undertake to dispose of in the order set forth in appellant's brief.

Assignments of error one, two, three and four, involving the admission over objection of certain testimony of respondent and other lay witnesses describing or touching alleged pain experienced by respondent subsequent to the operation and attributed thereto, and the refusal of the court to strike such testimony, may be grouped, discussed and considered together. It is appellant's contention that there was no evidence showing or tending to show that the pain alleged to have been suffered by respondent resulted from any act of negligence of appellant, that no foundation was laid for the receipt of such testimony, and that whether the presence of the needle caused such pain as described is a matter which should have been proved by expert testimony. There is expert testimony that with movement of respondent's body—bending forward or sideways—the point of the needle would cause discomfort and some pain, the amount of which the expert witness could not state, and that his earning powers are limited because of the presence of the needle. It is not seriously controverted that respondent did not experience such pain, as he described,

prior to the operation, and there is ample evidence that subsequent to the operation he did suffer constant pain in his chest in and about the region where the hypodermic needle was located. Likewise, there is evidence that prior to the operation respondent had performed and was able to perform ordinary manual labor. Respondent testified, among other things, that whenever he reached up with his arms, stooped over, took a deep breath, etc., he suffered severe pain "right in my chest." Other witnesses, over objection, testified that respondent after the operation had difficulty performing manual labor, was short-winded, and did not seem to have strength "to do a man's labor like he should have shown," and that he had difficulty in caring for cattle at the Blackfoot fair, in that "whenever he had to bend over or wrestle around with any of them, it hurt him and he couldn't do it." There is evidence, and the jury found, that appellant was responsible for the hypodermic needle finding its way into respondent's chest. It is unnecessary to recite all of the testimony given on this point, however, from a careful consideration of the evidence we are unable to agree with the contention that it did not show, or tend to show, that the pain suffered by respondent immediately resulted from the hypodermic needle left by appellant in respondent's chest at the time of the operation, but are of the opinion that the testimony complained of was not only admissible as tending to show the amount or extent of the pain suffered by respondent and the effect upon respondent's ability to perform manual labor, which the expert witness was unable to state (17 C. J. 1031, sec. 326), but likewise, under the following authorities was not erroneously admitted: *Walter v. England,* 133 Cal. App. 676, 24 Pac. (2d) 930; *Barham v. Widing,* 210 Cal. 206, 291 Pac. 173; *Nelson v. Parker,* 104 Cal. App. 770, 286 Pac. 1078; 10 Cal. Jur. 978. Neither are we inclined to the view that there was such uncertainty as to whether the pain and suffering was caused by the hypodermic needle or some other cause or causes that the jury were permitted to guess or conjecture as to the cause of pain. The expert testimony would seem to

establish beyond serious controversy that the pain suffered by respondent was due directly to the presence of the needle and not to some other cause or causes. While we recognize the rule contended for by appellant and expressed in the cases, namely: that the jury should not be permitted to disregard an extraneous existing cause certain to produce the result for a cause attributable to appellant, but from which the result may be said to be only conjectural, an examination of the evidence convinces us that the rule is not applicable here. The rule would seem to be that respondent was not required to prove his case beyond a reasonable doubt, nor by direct and positive evidence. It was only necessary that he show a chain of circumstances from which the ultimate fact required to be established is reasonably and naturally inferable. (*Helland v. Bridenstine*, 55 Wash. 470, 104 Pac. 626.) As is said in *Dimock v. Miller*, 202 Cal. 668, 262 Pac. 311:

"If the rule of law is as contended for by defendant and appellant, and it is necessary to demonstrate conclusively and beyond the possibility of a doubt that the negligence resulted in the injury, it would never be possible to recover in a case of negligence in the practice of a profession which is not an exact science." (*Walter v. England, supra; Barham v. Widing, supra; Roberts v. Parker*, 121 Cal. App. 264, 8 Pac. (2d) 908.)

■ Assignments of error five and six urge error in the admission in evidence of certain X-ray plates over the objection that no proper foundation for the offer was laid and that the plates were not properly identified and were incompetent. It is particularly urged that there is no testimony showing qualification of the technician or that the machine used was in good condition and of an approved type or that the plates represented a true, or even approximate, likeness of that which is claimed to exist in respondent's body. The evidence discloses that Dr. Germon, a physician and surgeon, rated as a radiologist or roentgenologist by the United States Civil Service Commission, in charge of the X-ray department of the Veteran's hospital,

together with his technician, X-rayed respondent, securing the plates in question, and that these plates remained in the files in Dr. Germon's office until produced at the trial. Some of the pictures were set, taken and developed entirely by Dr. Germon and settings for the remainder were made by Dr. Germon, and his technician, in his presence and under his direction, put his foot on the switch which placed in motion the mechanical operation of the machine taking the pictures. Since 1918 Dr. Germon had spent considerable time in this line of work and for some two years in Los Angeles had taken and developed approximately 25 X-ray pictures each day. Dr. Germon stated positively that these pictures of respondent's chest disclosed a hypodermic needle, standing perpendicular with the axis of the body, in the left chest, and that the plates represent correct dimensions and the correct location in respondent's body of the hypodermic needle. The accuracy and trustworthiness of the plates is further disclosed by the testimony of Dr. Germon that he assisted at the operation when removal of the needle was attempted and that at that time the same needle shown in the X-ray plates was found in respondent's thoracic cavity. Since the plates were identified as pictures of respondent's chest, made by, or in the presence and under the supervision and direction of, Dr. Germon, and for his diagnosis, and correctly portrayed the condition existing in respondent's body, we are of the opinion that they were properly admitted. (*State v. Reding*, 52 Ida. 260, 272, 13 Pac. (2d) 253; *Jenkins v. Charleston General Hospital & Training School*, 90 W. Va. 230, 110 S. E. 560, 22 A. L. R. 323; *Quinn v. Flesher*, 85 W. Va. 451, 102 S. E. 300; *Phillips v. Wilmington & Philadelphia Traction Co.*, 1 W. W. Harr. (31 Del.) 593, 117 Atl. 241; *Greco v. Schmidt*, 101 N. J. L. 554, 129 Atl. 146.)

Error is urged in permitting the witness Germon, testifying as an expert, to answer certain hypothetical questions concerning the probability of damage to respondent from the hypodermic needle and the probability of movement of such needle in respondent's body.

The alleged error involves the action of the court in permitting the witness to answer whether authorities disclose whether or not a hypodermic needle lodged in a human body is apt to corrode and become detached from the shank; whether or not such a needle, located in respondent's body as described in the hypothetical question, would affect respondent's ability to perform manual labor; the likelihood of the needle becoming dislodged and what would happen to or become of the upper portion of the needle in the event it did break off above the shank or hub, and in denying the motion to strike the answers and especially the following answer:

"It is difficult to state the amount of injury that might be done by such a thing as a hypodermic needle."

Summarizing the foregoing objections they present the one general and important question, namely: whether or not the court, in permitting, and thereafter refusing to strike, such testimony, permitted the witness to deal in possibilities rather than to be confined to that which would probably happen. The purpose of the testimony was, no doubt, to furnish additional proof of damage. The rule is, no doubt, as contended for by appellant, that evidence should not be admitted in a case of this character which is purely speculative, indefinite and uncertain. On the other hand, qualified witnesses should be permitted to testify as to results which may reasonably be expected to or probably will follow such an injury. Future damages should not be imposed where no future ill results will be suffered by reason of the injury, but expert witnesses may testify or give their opinion as to future consequences they believe reasonably certain to occur. (*St. Louis S. W. Ry. Co. of Texas v. Brown*, (Tex. Civ. App.) 163 S. W. 383; *Steburg v. Vincent Clay Products Co.*, 173 Iowa, 248, 155 N. W. 337; *Cross v. City of Syracuse*, 200 N. Y. 393, 94 N. E. 184, 21 Ann. Cas. 324; *Denver & R. G. R. Co. v. Roller*, 100 Fed. 738, 49 L. R. A. 77; *Manton v. H. L. Stevens & Co.*, 170 Iowa, 495, 153 N. W. 87.) Dr. Germon, when asked as to the probability of the needle in

respondent's body breaking, gave his own opinion, based on his experience as a physician and surgeon, that:

"There is always a possibility, through straining or coughing, or any abnormality, that may come with such strenuous exercise within the chest wall that the thing (the needle) might, due to its length, might break. As to the shank of the needle, I don't believe it will move."

The probability of the hypodermic needle in time corroding and breaking or becoming loose from the shank is not so improbable or uncertain that it is purely speculative or mere conjecture, and that if it should break or become loose from the shank, it appears from the evidence that in all probability parts of the needle would move about in the body of respondent and result in death or added pain and suffering. While it may be conceded that the question is close and authorities may be found for and against the admissibility of testimony of more or less similar character, in the light of all the testimony and a careful review of the evidence on this point, we do not feel justified in holding that the admission of this testimony was of such a prejudicial nature as to constitute reversible error. (*Manton v. H. L. Stevens & Co., supra.*)

■ To the question:

"As a physician and surgeon, doctor, do the authorities upon this subject disclose whether or not a hypodermic needle lodged in the body of a human being is apt in time, or will in time, corrode and become detached from the shank of the needle?"

Dr. Germon was permitted to answer: "Yes." Appellant's contention is that permitting the answer to this question was error because it is improper to permit medical experts to state what medical authorities teach on matters involved. No medical authorities were read or quoted from and we are not of the opinion that the rule can be extended to support appellant's contention that the answer was prejudicial and left with the jury the idea that medical authorities disclosed that the breaking of the needle might happen. As we read the record, the witness did not state

what the authorities disclosed as to the possibility or probability of the needle corroding or becoming detached from the shank.

■■ Appellant takes the position that mortality tables were not admissible for the purpose of proving the life expectancy of respondent for the reason that respondent was suffering from a physical disability, and that this is particularly true where there is no showing as to the effect of such disability upon life. The record discloses that while respondent was in the service in the World War he received an injury to his right leg and that several operations for varicose veins were performed on his right leg, which injury and operations were prior to the operation involved, and that by reason thereof he held eighteen per cent disability rating. It is contended no showing was made as to the effect of such disability upon respondent's life expectancy. The evidence, however, shows without contradiction that prior to the operation by appellant respondent was an ordinarily healthy man and performed manual labor such as the ordinary laboring man performed. The rule which we believe finds support in the majority of cases is that mortality tables are generally admissible to show the expectancy of life in a proper case, and are admissible when life expectancy is involved when the party is in normal health. (22 C. J. 925, sec. 1129.) There are cases holding that mortality tables are admissible although the person whose expectancy of life is in question is not in normal health. (*Mentz v. Omaha etc. R. Co.,* 103 Neb. 216, 170 N. W. 889, 173 N. W. 478; *Fifield v. Rochester,* 89 Vt. 329, 95 Atl. 675, Ann. Cas. 1918A, 1016; *Culp v. Virginia R. Co.,* 77 W. Va. 125, 87 S. E. 187; *Cubbage v. Estate of Conrad Youngerman,* 155 Iowa, 39, 134 N. W. 1074.) In the case at bar there was no evidence showing that either the injury sustained by respondent to his leg or the operations performed thereon resulted in impairment calculated to shorten life. There is evidence, however, that respondent was an ordinarily healthy man, from which we may presume no physical condition that might involve his life expectancy.

Appellant urges that the court erred in denying his motions for nonsuit and directed verdict made upon the ground that there was no competent evidence establishing negligence on the part of appellant or that respondent suffered damage from or by reason of any act of negligence on appellant's part. The findings of the jury are conclusive against appellant and we must assume the fact established that the hypodermic needle described in the complaint found its way into the body of respondent during the operation performed by appellant; that as a result of the needle being left in respondent's body he endured great pain and suffering; that while the operation in and of itself was successfully performed, negligence consisted, not in the performance of the operation, but in knowingly, negligently and carelessly leaving the needle in respondent's body and in failing to remove the same therefrom. We must also, by reason of the verdict, assume that the needle which was attached to the syringe became disconnected therefrom and found its way into the thoracic cavity of respondent with appellant's knowledge. The jury accepted as established facts, and we are bound by their findings, there being sufficient competent evidence to sustain the same; that during the performance of the operation appellant used a syringe on the end of which there was a hypodermic needle approximately two and three-quarters inches in length; that appellant put it into respondent's body and when he pulled it out he looked down at the floor and said, "G—— d—— it," and handed what looked like a part of the syringe to the nurse; that thereafter the syringe did not look the same, but looked like the point was broken off, and thereafter respondent had an awful pain in his chest on the inside and appellant said to the nurse, "Get me another one," and that she handed appellant another one; that the operation was thereupon completed and no effort was made to remove the needle, the wound was sewed up and respondent was discharged from the hospital with the needle in his thoracic cavity, and that the needle was thereafter located in respondent's chest, where it still remains. All the foregoing

facts were established by respondent to the satisfaction of the jury. It has been variously held that a surgeon's failure to remove a foreign object, such as a sponge, gauze pad, part of an instrument, etc., is negligence *per se*, necessarily negligence, and negligence, and in all events it is uniformly held that the failure to remove such a foreign object is evidence of negligence and sufficient for submission to the jury without the aid of expert testimony. In *Moore v. Ivey*, (Tex. Civ. App.) 264 S. W. 283, 288, the court said:

"Since the jury found upon sufficient evidence that Dr. Moore left the sponge in Mrs. Ivey, we think that a further finding that such act constituted negligence on the part of Dr. Moore necessarily follows."

"Probably the most common instance of malpractice which is brought into the courts arises out of surgical cases where the physician or attendant has left a sponge in the wound after the incision has been closed. That this is plainly negligence there is no doubt at all, and it matters not at all that many physicians testify that the best of surgeons sometimes leave a sponge or some other foreign substance in the bodies of their patients, for this is testimony merely to the effect that almost everyone is at times negligent. Whether the particular act was negligent is for the jury to decide after considering the circumstances of the case." (21 R. C. L. 388.)

In *Wharton v. Warner*, 75 Wash. 470, 135 Pac. 235, it was held that where a surgeon loses a metallic spring in the body of his patient, and fails to discover and remove it, the jury has abundant justification for inferring negligence without the aid of expert testimony. (See, also, *Vergeldt v. Hartzell*, 1 Fed. (2d) 633; *McCormick v. Jones*, 152 Wash. 508, 278 Pac. 181, and note 65 A. L. R. 1023; *Saucier v. Ross*, 112 Miss. 306, 73 So. 48; *Reeves v. Lutz*, 179 Mo. App. 61, 162 S. W. 280; *Ruth v. Johnson*, 172 Fed. 191; *Wynne v. Haney*, 96 Wash. 379, 165 Pac. 67; 48 C. J. 1131, sec. 123.) There being sufficient competent evidence to support the verdict and judgment entered thereon, no error was committed in refusing appellant's motions for

nonsuit and directed verdict. (*Isaak v. Journey*, 52 Ida. 392, 15 Pac. (2d) 1069; *Lightner v. Russell & Pugh Lumber Co.*, 52 Ida. 616, 17 Pac. (2d) 349.)

 Appellant complains of the refusal of the court to give certain instructions. We have carefully examined the instructions given by the court and the instructions refused. Some of the instructions refused were covered by the court's instructions, and from a consideration of the entire charge we are satisfied that the instructions as a whole are not unfavorable to appellant, but are fair and responsive to the issues and evidence and no error was committed by the court's refusal to give appellant's proposed instructions.

 Coming to the question of damages, which appellant urges are excessive, we know of no rule that will enable us to reduce the damages. Damages, if any, flowing from an injury such as respondent sustained, that is, for pain and suffering and loss of income due to the particular injury, are susceptible to proof only with an approximation of certainty, and it is solely for the jury to estimate them as best they can by reasonable probabilities, based upon their sound judgment as to what would be just and proper under all of the circumstances, which may not be disturbed in the absence of some showing that the jury were biased or prejudiced or arrived at the amount in some irregular manner. (*Davis v. Potter*, 51 Ida. 81, 2 Pac. (2d) 318; *McCoy v. Krengel*, 52 Ida. 626, 17 Pac. (2d) 547; *Hayhurst v. Boyd*, 43 Ida. 661, 254 Pac. 528; *Osier v. Consumers Co.*, 42 Ida. 789, 248 Pac. 438; *Short v. Boise Valley Traction Co.*, 38 Ida. 593, 225 Pac. 398; *Faris v. Burroughs Adding Mach. Co.*, 48 Ida. 310, 282 Pac. 72; *Nelson v. Johnson*, 41 Ida. 697, 243 Pac. 647; *Reynolds v. Struble*, 128 Cal. App. 716, 18 Pac. (2d) 690, 698.)

The judgment is affirmed. Costs awarded to respondent.